**ASTRO SCIENCE CORPORATION**
v.
**The UNITED STATES.**
No. 418–67.

United States Court of Claims.
Jan. 18, 1973.

Walter F. Pettit, San Francisco, Cal., atty. of record for plaintiff. Harold C. Nachtrieb, Allan J. Joseph, and Miller, Groezinger, Pettit, Evers & Martin, San Francisco, Cal., of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

KUNZIG, Judge.

This is a contract action wherein this court, by cross motions for summary judgment, has been asked to review a decision of the Armed Services Board of Contract Appeals (Board)[1] in accordance with the standards established by the Wunderlich Act, 41 U.S.C. §§ 321–322 (1970).

In issue is the classification and subsequent standard of acceptability to be applied to a "preproduction model". We hold that the model in this case must be treated as an end product and thus the standard of acceptability as espoused in Radiation Technology, Inc. v. United States, 366 F.2d 1003, 177 Ct.Cl. 227 (1966), is applicable. Accordingly, we find that the Board's decision in favor of the government is correct as a matter of law and is supported by substantial evidence.

Plaintiff's predecessor, American Astro-Systems, Inc., entered into a fixed price supply contract with the United States Army on January 18, 1962, for the manufacture and delivery of 47[2]

metal and plywood shelters for utilization by the defendant in the Hawk Missile Program. These shelters were designed to house equipment and/or personnel and were easily transportable. The contract specified six different types of shelters, each varying in design to accommodate the particular use intended. The various samples were designated as Shop 2, Shop 4, Shop 5, Shop 6, Shop 7 and Battery Control Center. Prior to full scale production, the contractor was required to deliver a "preproduction sample" of each of the varying configurations for inspection. After inspection, an acceptable sample would constitute delivery against the quantity ordered, i. e. the preproduction sample and the first production unit would be one and the same. The contract further provided that failure of the contractor to deliver a "preproduction sample" for testing, or failure of such sample to meet the requirements of the invitation for bid or contract might be regarded as failure to make delivery within the meaning of the standard default article and thus be grounds for default termination.

After several contract modifications altering the specifications and delivery dates, the contractor began delivery of the various samples. Shops 2 and 4 were delivered on October 1, 1962 and were rejected for obvious physical discrepancies. On November 9, 1962, Shop 5 was timely delivered. It was then transported to an independent testing laboratory for environmental and structural tests pursuant to the specifications of the contract.

On December 28, 1962, the contracting officer notified the contractor by letter of the government's intention to terminate the contract for default and gave the contractor ten days to offer a complete explanation of its failure to perform and to cure the defects. Meanwhile, the contractor was formally notified that Shop 5 was rejected as a result of the testing. Despite the contractor's explanation, the contracting officer terminat-

---

1. American Astro-Systems, Inc., 66–1 BCA ¶ 5561.

2. The total was increased to 49 pursuant to modification No. 7, June 29, 1962.

ed the contract for default on January 31, 1963.

The contractor timely appealed the contracting officer's decision to the Board which affirmed the decision to terminate. The Board explicity based its decision upon the rejection of the Shop 5 sample and did not deem it necessary to consider the defects in other models. Plaintiff contractor filed a petition in this court on December 26, 1967 seeking a reversal of the Board's decision on the grounds that the decision was erroneous as a matter of law and was not supported by substantial evidence. Plaintiff alleges that it is entitled under the contract to have the termination converted to one of termination for the convenience of the government.

Plaintiff's primary contention is that the Board, as a matter of law, erroneously judged the Shop 5 model as an end product rather than as a preproduction sample. Admittedly, the standards of acceptability of the two types of products differ. Plaintiff argues that the standard for preproduction samples is that of capability, i. e., can the contractor furnish a product that is satisfactory for its intended use? On the other hand, the standard for end products would be one of substantial compliance with the contract specifications as we clearly stated in Radiation Technology, Inc. v. United States, *supra.*

█ We find it unnecessary in this case to draw the distinction between standards of acceptability for preproduction samples and for end products. We hold that the sample required by this contract must be judged as an "end product".

The instant contract provided that acceptable samples would constitute delivery as against the quantity ordered. Plaintiff cites Bailey Specialized Bldgs., Inc. v. United States, 404 F.2d 355, 186 Ct.Cl. 71 (1968), which contained similar language, for the proposition that such language does not change the character of the sample product. We find that the facts of *Bailey* are clearly distinguishable from the instant situation

and thus we are free to come to a different conclusion without disturbing that decision.

In *Bailey* the contractor was awarded a firm fixed price contract for the fabrication of three (3) unassembled steel towers. A preproduction model was to be available for inspection on or before October 28, 1964. Thereafter, the three production towers were to be delivered four, five, and six weeks respectfully from the date of the acceptance of the preproduction sample. The parties had agreed that the first production model would be considered to be the preproduction model. Thus after acceptance of the preproduction unit the contractor still had 30 days in which to correct deficiencies prior to the delivery date of the first production unit.

In the instant case, the delivery schedule, although modified several times, did not provide for a time lag between delivery of an acceptable "preproduction sample" and delivery of the first production unit. Thus once a "preproduction model" was accepted, it was immediately considered a delivery against the quantity ordered and had to thus satisfy the more stringent standards for end products.

█ Plaintiff's alternative argument is that even if the Shop 5 sample is deemed to be an end product, it did in fact meet the more stringent standards of *Radiation Technology, supra.* Plaintiff argues that the defects listed in the rejection letter of January 3, 1963 were either minor in nature or the result of improper testing and/or design deficiencies; it was thus entitled to a reasonable time to cure the defects. Although there were some improper tests and problems with specifications, we find that there was substantial evidence to merit the Board's conclusion that there were "substantial nonconformities" in the Shop 5 shelter clearly not attributable to the improper testing or defective specifications. We concur with the Board that the defects discovered were major and thus default termination was proper under the *Radiation Technology* standards.

■ This court stated in Radiation Technology, Inc. v. United States, *supra* that a contractor is entitled to a cure period if the goods shipped are in substantial conformity with contract specifications. The right to cure assumes that the defects are of a nature susceptible to correction within a reasonable time. In considering the question of compliance the court also considered the usability of the items and the urgency of the government's demand. *Id.* 366 F. 2d at 1006, 177 Ct.Cl. at 232. In the instant case, some of the defects discovered clearly made the shelter inoperable. There was also a showing by the government of a certain degree of urgency in receiving these shelters, for they were an intricate part of a complex missile system.

The defects identified by the independent testing concern were not all serious enough to warrant default termination. However, there were enough to support a decision to reject the shelter on the grounds of substantial nonconformities.

During the environmental and structural tests of the missile shelter certain nonconformities became evident which can only be categorized as substantial. At the conclusion of the water immersion test, there was water inside the shelter contrary to the specifications requiring waterproofness. During a test to determine the strength of the failsafe links, one link failed at a force less than that specified in the contract. Furthermore, nonconformities were also discovered following the floor deformation test which was designed to assure that the floor construction would support certain weights. Finally, certain inserts were missing—a defect which was specifically classified as major in the contract specifications. The aggregate effect of these defects is sufficient to support the Board's finding of substantial nonconformities.

■ Although plaintiff alleges that certain other tests were improperly conducted, we find insufficient evidence to rebut the presumption that the water immersion, failsafe link, and floor deformation tests were conducted properly. The burden is upon the contractor to rebut this presumption. The Lutz Company GSBCA No. 2237, 68–1 BCA ¶ 6767 (1967); *see generally* 3 J. McBride and I. Wachtel, Government contracts § 27.40 [7] (1972). Plaintiff has not met this burden.

In light of the above, it is difficult for this court to accept plaintiff's statement that the defects were minor or the result of improper testing. We conclude that the Board opinion withstands a Wunderlich Act Review. The Board applied the proper standard of acceptability and there is substantial evidence to support its conclusion that the contracting officer properly terminated the contract for default.

Accordingly, the plaintiff's motion for summary judgment is denied and the defendant's cross motion for summary judgment is granted.[3] The petition is hereby dismissed.

---

3. There is no judgment for reprocurement costs since the defendant did not file a counterclaim for such costs.