INTERNATIONAL TELEPHONE & TELEGRAPH CORPORATION, ITT DEFENSE COMMUNICATIONS DIVISION

v.

The UNITED STATES.

No. 230–72.

United States Court of Claims.

Jan. 22, 1975.

Stanley Dees, Washington, D. C., attorney of record, for plaintiff; Gilbert A. Cuneo, Sellers, Conner & Cuneo, Washington, D. C., N. J. Villarosa and William C. Wolff, Nutley, N. J., International Telephone and Telegraph Corp., of counsel.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before SKELTON, MARKEY[†] and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

KUNZIG, Judge: [*]

This is a contract action wherein this court, by cross motions for summary judgment, has been asked to review a decision of the Armed Services Board of Contract Appeals (the Board)[1] in accordance with the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970).

In issue is whether the Board's decision that the Government was entitled to terminate plaintiff's preproduction model contract[2] for default is supported by substantial evidence and is correct as a matter of law.

We hold that plaintiff's contract was terminated for the convenience of the Government and, therefore, reverse the decision of the Board.

In arriving at its decision that termination for default was proper, the Board concluded that the Government had unilaterally established February 19, 1968 as the contract completion date and this date was reasonable under the circumstances. Alternatively, the Board found that the Government had a right to terminate for default on February 19, 1968, irrespective of whether this date had been unilaterally established as the contract completion date, because plaintiff tendered delivery and the system was not in substantial compliance with the specifications.[3]

These conclusions of the Board involve mixed questions of law and fact. We do not deem it necessary to attempt to distinguish the two, since disposition of this case does not require such delineation.

We find the Board's conclusions in favor of the Government insufficient to withstand Wunderlich review. Since we find that February 19, 1968 had not been unilaterally established as the new contract completion date nor had plaintiff tendered delivery of the system on that date, we hold plaintiff's termination was for the convenience of the Government

---

Chief Judge of the United States Court of Customs and Patent Appeals, sitting by designation pursuant to 28 U.S.C. § 293(a) (1970).

[*] We are indebted to Trial Judge Charlotte P. Murphy for her recommended opinion which we have utilized in part, though we have substituted our own in reaching a different result.

1. ASBCA No. 13385 (September 29, 1971).

2. For a detailed discussion of preproduction models, see Astro Science Corp. v. United States, 471 F.2d 624, 200 Ct.Cl. 354 (1973).

3. The Board also found that the plaintiff-contractor was not entitled to an additional reasonable period after February 19, 1968 in which to cure nonconformity, since the defects present upon the February 19, 1968 purported delivery were substantial and the plaintiff-contractor had sufficient time between original testing and delivery to correct any deficiencies. Since we find that February 19, 1968 was neither the contract completion date nor the date when delivery of the system was tendered, we need not consider whether plaintiff-contractor was given a reasonable period after that date to cure defects.

and thus remand the suit for administrative finding of the amount due plaintiff.

## BACKGROUND

The following are the background facts from which the legal issues arise. They are as found by the Board or are otherwise undisputed.

Plaintiff, ITT Defense Communications Division,[4] entered into a contract with defendant dated May 2, 1966. The contract, executed after competitive negotiations based on a request for proposals, required plaintiff to fabricate and deliver an Automatic Routing Line Segregator (ARLS) for a fixed price of $364,404. The contract called for delivery one year later (May 2, 1967). The General Provisions of the contract included the standard Default and Disputes articles prescribed for fixed-price supply contracts.

The first and only ARLS system required under the contract was described as a preproduction model. About a year later, the system was designated as a prototype and the Government agreed to waive any discrepancies which did not affect the functional integrity of the system. The contract included a clause which provided the Government with an option exercisable by December 30, 1966 to purchase ten production units of the ALRS at a unit price of approximately $115,000. Defendant never exercised this option.

The ARLS was intended automatically to segregate messages in accordance with the desired routing line and was intended to function within a communications center. It was designed to accept paper punched tape containing a message, multiple addressees, and certain other information. After analyzing the tape, the ARLS was to reproduce separate paper punched tapes containing the message for each group of addressees who were to receive the message via a particular routing line. An operator then would take the tape from one of the output locations (21 reperforators) and feed it into the transmitting equipment for a particular routing line.

The ARLS consists of three basic units: (1) Cabinet A with a computer or processor; (2) Cabinet B containing certain peripheral equipment associated with the computers, such as a core memory and two readers, identified as Readers A and B, through which messages would be fed into the system; and (3) seven C cabinets, each containing three reperforators, the devices which punch the new output tapes with addressees segregated by routing lines. The system also contains a printer, similar to a typewriter, which would print out the "header" of the message (the addressee, the security sign, the priority sign, etc.), but not the text of the message itself. While equipment similar to the ARLS had been constructed by plaintiff in the past, this particular system had not been constructed previously. It was expecially complex and difficult because of the radio frequency interference (RFI) requirement imposed on the entire system by defendant's specifications.

Plaintiff was not ready to deliver in May 1967, as contractually required, but represented in a June 1967 letter to the contracting officer that October 30, 1967 appeared to be the earliest possible delivery date of the system. The delays plaintiff had encountered, and continued to encounter for several months, were partially due to problems in obtaining suitable cabinets. Although the Government internally discussed the question of delivery dates shortly after the May 2, 1967 contractual delivery date passed, it did not discuss the matter with plaintiff. At the time, the Government still wanted the system, knew of the progress plaintiff had made, *and did not confront plaintiff concerning performance delays.* Apparently, the Government did not consider October 30, 1967 as an actual delivery date. *During the six-month period beginning May 2, 1967, the Government made no attempt to terminate the contract for failure to deliver.*

---

4. An administrative successor to ITT Federal Laboratories.

As early as November 1, 1967, plaintiff's Vice President for Contract Administration, Nicholas J. Villarosa, Jr., represented to the contracting officer that delivery of the system was estimated to occur no earlier than February 9, 1968. A demonstration of the prototype then took place on November 17, 1967. This demonstration was designed to exhibit that the system was at that time able to accept a message, read it in, and, by punching output tapes, achieve routing line segregation. Although one of the readers failed to operate, these basic functions of the system were demonstrated. Defendant's internal reaction to the demonstration was that plaintiff had a long way to go to produce a deliverable system.

On that occasion, the Government learned that in view of increased costs and the fact that the Government's purchase option had lapsed nearly a year before, additional systems would cost $320,000 each, instead of the contractual price of about $115,000 each. This information caused the Government to reevaluate its need for the system. Plaintiff on November 17, 1967 again estimated that delivery would occur on February 9. According to plaintiff's internal progress schedule, in order to meet this estimated delivery date, RFI testing was to be completed by January 5, 1968 and 5 days of acceptance testing was to commerce on January 28, 1968. The Government was fully aware of these and other "milestones" in plaintiff's schedule.

During the period from May 2, 1967 through the end of that year, the Government repeatedly indicated its desire that plaintiff continue to perform, even though the contractual delivery date had passed and no firm new date had been set.[5]

By letter dated December 12, 1967, the Government sought to establish February 9, 1968, as the new contract delivery date. This letter, purporting to accept plaintiff's suggestion that February 9, 1968 could become the delivery date, contained two conditions unacceptable to plaintiff: (1) imposition of liquidated damages of $600 a day for additional delay and (2) reinstatement of the option clause to February 29, 1968. The latter condition alone would have resulted in a loss of more than $200,000 per unit, or over two million dollars, to plaintiff.[6] Plaintiff rejected the proposal.

In its December 26 and January 23 monthly reports, plaintiff stated that the system's delivery was still anticipated as of February 9, 1968. An internal log entry of the Government's Contract Administration and Settlement Branch dated January 5, 1968, revealed that:

It was decided that an amendment extending the final delivery date of the item under the Contract to on or about 9 Feb. 68 would be issued by CAS to give the government a firm legal foundation on which to place itself for a termination for cause position. Such an amendment, *bilateral in nature,* is being sent ITT. [emphasis added]

Defendant proceeded to forward a proposed bilateral agreement[7] setting February 9, 1968 as the date for final delivery. *Plaintiff did not sign or return the proposed agreement.* On February 9, 1968, acceptance testing commenced but came to a halt when the system would not accept the expected number of rout-

---

5. For example, in an internal Government memorandum of December 26, 1967 [App. Exh. 11], it was stated that "[w]e have agreed to a series of delays since May on the thesis that the final system would meet our specifications and yield a production run of systems that would provide a cost-effective solution to our operational problems."

6. The Government sought to reinstate the lapsed option clause to buy 10 more ARLS at the fixed contract price, on the ground that

the option could not be exercised unless and until there had been a demonstration and approval of the prototype. This approach, however, was contrary to the terms of the contract, which provided for exercise of the option by December 30, 1966, a date over four months in advance of the original contractual delivery date of May 2, 1967.

7. Proposed Amendment No. 2, dated January 8, 1968.

ing instructions for individual addressees. Another problem observed by the Government during the test was that Reader B would not properly read input tape.[8]

The tests were adjourned on February 9 by mutual agreement pending location and cure of the problems encountered, with defendant's representatives agreeing to return to resume testing. *Prior to adjournment, plaintiff again refused to sign the proposed bilateral agreement in view of the test failure.*

Since plaintiff neither executed nor returned this twice-offered agreement, the Board correctly found that February 9, 1968 was not established as a delivery date. Plaintiff felt that the proposed bilateral agreement was an attempt by defendant to establish a basis for terminating plaintiff for default. Also, since plaintiff had encountered further slippages related to FRI testing during January and had witnessed the Government's suspension of February 9 testing, plaintiff no longer considered February 9 to be a reasonable delivery date.

According to Mr. Villarosa's uncontradicted testimony, when defendant's representatives did not appear for the resumption of testing on February 13, 1968, plaintiff inquired and learned that a termination decision had been reached. Plaintiff then requested a meeting with defendant's representatives on February 15, 1968, in order to prevent termination for default.[9] In pursuing this effort to avert termination for default, Mr. Villarosa informed the Government in a letter dated February 14, 1968 that the system was operating in accordance with specification requirements and was ready for shipment, even though the system hadn't worked on February 9, 1968.

At a meeting with defendant's representatives on February 15, 1968, Mr. Villarosa questioned the Government's desire for the system and requested resumption of the testing. With an awareness of the Government's termination decision, he again said that the system was ready for delivery. Defendant's representatives then handed plaintiff's representatives a letter dated February 15, 1968, containing blank spaces which plaintiff was requested to fill in with a date, selected from any of the thirteen days remaining in February. The letter stated that the contract would be terminated for default if the tests were not completed successfully on the selected day and that the Government's view was that February 9, 1968 had become the new contractual delivery date. *Mr. Villarosa refused to sign the document, but defendant nevertheless agreed to send its representatives back on February 19, 1968 (a date selected by the Government) to witness resumption of tests.*

Prior to the resumption of testing on February 19, plaintiff was handed a letter dated February 16, 1968, which reaffirmed the Government's position that February 9, 1968 had become the new delivery date and stated that if the system failed to meet the contract specifications during the ensuing tests, there would be a termination for default pursuant to the contract.

The Government learned on February 19, 1968 that Reader B was still in the repair shop, two of the reperforators were not operational, and manual

---

**8.** On February 15, 1968, this reader was returned to the manufacturer for repairs after it was learned that the repair work could not be accomplished at plaintiff's plant.

**9.** While the Board omitted findings of fact covering the February 13, 1968 events and the purpose of the February 15, 1968 meeting, the evidence is undisputed as to these facts. Since there is substantial evidence to support them, they have been supplied. There is sufficient precedent to the effect that where the Board fails to make findings of fact fully supported by the Board record and required by that record, this court may make such findings in order to avoid remanding for the purpose of directing the Board to arrive at the inescapable finding. Liles Constr. Co. v. United States, 455 F.2d 527, 197 Ct.Cl. 164 (1972); Foster Const. C. A. v. United States, 435 F.2d 873, 879–880, 193 Ct.Cl. 587, 600 (1970); Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 870, 181 Ct.Cl. 607, 631 (1967).

"patches" were present in the system's programming materials. Notwithstanding these problems, the tests proceeded. Plaintiff's program manager still felt that defendant's requirements could be met. Difficulties developed in the system during the introduction of test messages and the tests were again terminated on February 19, 1968.

Plaintiff, by letter dated February 26, 1968, stated that the failure of the message test was not due to any fault on its part and that most deficiencies in the system had been located or corrected. However, before this information reached the Government representatives, the contracting officer on February 26, 1968 terminated the contract for default for failure to deliver the system required by the contract.[10] As of the termination date, nearly nine months after the original contractual delivery date, plaintiff had expended in excess of $700,000.

Plaintiff timely appealed from the final decision of the contracting officer terminating the contract for default. The Board on September 29, 1971 concluded that the termination for default was proper and denied plaintiff's appeal. In its petition filed May 31, 1972, plaintiff brought this action under the general jurisdiction of this court, 28 U.S.C. § 1491 (1970), for review of the administrative decision under both sections of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1970).

## UNILATERAL ESTABLISHMENT OF CONTRACT COMPLETION DATE

Plaintiff contends that the Board erred in finding February 19, 1968 had been established unilaterally as the new contract completion date. Defendant, on the other hand, argues that the Board's determination should be accorded finality by this court.

We hold plaintiff's position to be correct.

Even though the Board properly refused to find that February 9, 1968 ever became an enforceable contract delivery date, it nevertheless gratuitously concluded that February 19, 1968 was established as the new contract delivery date. It was the Board's opinion that the Government's letter of February 15, 1968 served as a *unilateral* notice establishing a point in time at which the contractor would be considered in default if the system failed to comply with the contract performance requirements.

The Board felt that, although plaintiff had declined to fill in the blanks of the February 15 letter, "the Government representatives in effect did so by informing appellant [plaintiff] that they would return for further testing on 19 February."

According to the Board, the letter was not drafted as a contract amendment and was only bilateral with regard to the fact that the Government requested plaintiff to insert a February date for final acceptance tests. The Board also felt that plaintiff's signature was intended only to represent acknowledgement of receipt and understanding of the contents, but not necessarily agreement.

While the Board concluded that the Government unilaterally established February 19, 1968 as the contract completion date in accordance with DeVito v. United States, 413 F.2d 1147, 188 Ct.Cl. 979 (1969), this conclusion is erroneous. Plaintiff correctly contends that the only action taken at the meeting of February 15, 1968, was the agreement that the Government would resume testing on February 19, 1968. It seems clear that the February 15 letter, containing blanks instead of specific dates, did not comply with *DeVito*.

Under the *DeVito* rule, in a waiver after breach situation, time may again become essential and the Government may regain the right to terminate a delinquent contractor for default, if (1) the Government unilaterally issues a notice under the contract's Default clause establishing a reasonable but specific time for performance on pain of default termination, or (2) the parties bilaterally

10. Plaintiff first learned of the termination decision by telephone on February 23, 1968.

agree upon a new delivery date. *DeVito, supra,* 413 F.2d at 1154, 188 Ct.Cl. at 991 ·92. In order to reestablish a contractual delivery date, the Government must " \* \* \* agree with plaintiff on a new delivery schedule or give the plaintiff notice of a new delivery schedule which would be reasonable as to time." Bailey Specialized Buildings, Inc. v. United States, 404 F.2d 355, 359, 186 Ct.Cl. 71, 79 (1968).

### A. Specific

■ In *DeVito,* the court specifically set out the procedure which the Government must follow unilaterally to establish a new delivery date and stated:

\* \* \* The proper way thereafter for time to again become of the essence is for the *Government to issue a notice under the Default clause setting a reasonable but specific time for performance* on pain of default termination. \* \* \* The notice must set a new time for performance that is both reasonable and specific from the standpoint of the performance capabilities of the contractor at the time the notice is given. [Emphasis supplied]. (*DeVito, supra,* 413 F.2d at 1154, 188 Ct.Cl. at 991 92.

At another point in its opinion, the court said that the unilateral notice must " \* \* \* *clearly set a new schedule.*" [emphasis supplied]. *DeVito, supra,* 413 F.2d at 1155, 188 Ct.Cl. at 992.

The letter of February 15, 1968 containing a blank space for a final test date in February did not meet these procedural requirements, for not only did this letter fail to set a specific time for performance, but also it failed to set any time for performance. According to *DeVito,* if the Government unilaterally decides to set a new delivery date, this specific information must be conveyed to the contractor by an appropriate notice. No such notice was ever received by plaintiff in the instant case.

In this connection, the similarities between the instant case and Bailey Specialized Buildings, Inc. v. United States, *supra,* are pertinent. In *Bailey,* subsequent to the contractual delivery date, the Government accepted the plaintiff's proposed revised schedule which listed a date when a preproduction model would be available for inspection and later dates when the contract items would be delivered. *Bailey, supra,* 404 F.2d at 358, 186 Ct.Cl. at 76–77. Finding various defects to exist on the inspection date, the Government proceeded prior to the first revised delivery date to terminate the contractor for default. The court held that the termination was improper, since the mutually agreed upon revised schedule had only set a particular date as the date when the model would be available for inspection, and there was no requirement that it be delivered without defects on that occasion. *Bailey, supra,* 404 F.2d at 359–60, 186 Ct.Cl. at 81.

■ Although the parties in the instant case had not contractually agreed that February 19 would serve as a date when acceptance testing would resume, they did agree to resume the tests on that date. Since default terminations must be strictly construed, *DeVito, supra,* 413 F.2d at 1153, 188 Ct.Cl. at 990, it is concluded that just as the language "available for inspection" in *Bailey* was not considered to establish a date upon which a default termination for failure to deliver the contractual item could be based, the agreement in the instant case that the parties resume testing on February 19 should also not be regarded a suitable basis for a default termination.

Plaintiff also correctly points out that the Government's own conduct is inconsistent with the Board's finding that the Government established February 19 as the contract delivery date. Throughout the administrative proceedings, it was the Government's position that February 9 was the new delivery date. Both the letters of February 15 and February 16 contained language that the letters were not an extension of the delivery date of February 9, 1968. As plaintiff suggests, it does not appear that the Government

at any time treated February 19, 1968 as the new delivery date.

For all the previously enumerated reasons, it is concluded that the Board's determination that February 19, 1968 was unilaterally established as the *specific* contract completion date is incorrect.

### B. *Reasonable*

The Board also found that February 19, 1968 was a reasonable contract completion date under the circumstances existing on February 15, 1968, because plaintiff had represented on February 14 and 15 that the system was ready for delivery. This finding was based on plaintiff's failure to object on February 15 to the resumption of tests on February 19. The Board indicated that plaintiff's inaction implied acceptance of the alleged unilateral selection by the Government of February 19 as the new contract completion date.

This court has said that the unilateral setting of a new delivery date must not only be specific but also *reasonable*. The standard of reasonableness should be judged from the standpoint of the performance capabilities of the contractor at the time the notice is given. *DeVito, supra,* 413 F.2d at 1154, 188 Ct.Cl. at 991–92.

The Board's finding placed substantial reliance on the contents of plaintiff's letter of February 14 and statement of February 15 that the system was acceptable and ready for delivery as evidence that the February 19 date was a reasonable contract completion date.

 While plaintiff does not deny that it made the above representations, it asserts that both these and earlier representations regarding the potential February 9 delivery date were based on its knowledge of the Government's desire subsequent to November 17, 1967 to terminate plaintiff for default.[11] The

11. Plaintiff also asserts that its February 14 and 15 representations should be viewed in the context of the fact that it learned on February 13 that a termination notice had been issued. Plaintiff calls attention to the fact that it had spent over $700,000 to produce an item priced at about $360,000 and had worked nine months beyond the original contract delivery date. Plaintiff submits that the Board unduly relied on these representations and that plaintiff was acting under duress when it made the representations.

In support of its assertion that it is duress for the Government to threaten to terminate a contractor for default when it does not possess the right, plaintiff cites Universal Sportswear, Inc. v. United States, 180 F.Supp. 391, 145 Ct.Cl. 209 (1959), in which the court found that duress existed where a contractor, under a threat of default termination, signed a contract amendment requiring changes without monetary compensation and Urban Plumbing and Heating Co. v. United States, 408 F.2d 382, 187 Ct.Cl. 15 (1969), cert. denied, 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970), in which the court voided a contract amendment signed by the contractor under a threat of default termination, since the Government did not possess the right to terminate at the time the plaintiff signed, for the performance delay was in fact caused by the Government. Although plaintiff concedes the factual dissimilarities between these cases and the instant case, it still maintains that since it was acting under duress when it made the

representations, they should not be used as the sole justification for a conclusion that February 19 was a reasonable date, for these statements logically followed plaintiff's becoming aware that the Government had prepared a default notice.

Clearly, plaintiff was under a great deal of pressure in the weeks subsequent to November 17, 1967 and this pressure must have intensified after its conversations with the Government on February 13, 1968. However, pressure, even the threat of considerable financial loss, is not the equivalent of duress. DuPuy v. United States, 67 Ct.Cl. 348, 381 (1929), cert. denied, 281 U.S. 739, 50 S.Ct. 346, 74 L.Ed. 1153 (1930); Adler Const. Co. v. United States, 423 F.2d 1362, 191 Ct.Cl. 607 (1970). The elements necessary for duress have been stated by this court in Fruhauf Southwest Garment Co. v. United States, 111 F.Supp. 945, 951, 126 Ct.Cl. 51, 62 (1953):

"[T]hree elements are common to all situations where duress has been found to exist. These are: (1) that one side involuntarily accepted the terms of another; (2) that circumstances permitted no other alternative; and (3) that said circumstances were the result of coercive acts of the opposite party. . . .
In order to substantiate the allegation of economic duress or business 'compulsion, the plaintiff must go beyond the mere showing of a reluctance to accept and of financial embarrassment. There must be a showing of acts on the part of the defendant which produced these two factors. The assertion of duress

Board in its decision recognized that the Government's termination motivation was a result of its learning that the contract purchase option at a fixed price per unit could not be exercised, thus reducing the requirement for the ARLS system due to lack of funds to procure additional systems. Not only does the record indicate that the Government internally considered the termination idea, but it also contains strong evidence that this idea was made apparent to plaintiff. The letter of December 12, 1967 and the events surrounding the Government's efforts to get plaintiff to execute the proposed bilateral agreement containing a reinstatement of the option clause well illustrate this point.

■ Plaintiff contends that, contrary to the Board's conclusion, the *DeVito* reasonableness requirement was not met since the Government knew or should have known that, as of February 15, February 19 was not a reasonable delivery date. This contention has merit. Exactly what the Government learned or could have learned of plaintiff's prospective performance capabilities as a result of the February 9 tests and through the February 15 meeting is material in evaluating this contention, irrespective of plaintiff's self-serving statements to avoid default.

At the February 9 tests, the Government witnessed that only about 300 of the contemplated 600 routing indicators could be read into the ARLS system and no test messages were run. Plaintiff at that time was unable to determine whether the difficulty was one with the hardware or the software. During the February 9 testing, Reader B could not properly read the input tape. On Febru-

ary 15, this reader was returned to the manufacturer for repairs, since the work could not be accomplished at plaintiff's plant. In view of the known circumstances, it was not reasonable for the Government to expect that Reader B would definitely be in operable condition on February 19, only ten days after its malfunction. Certainly, plaintiff could not deliver à complete system while one of the readers was being repaired. Based on this and other problems which existed on February 9 and were observed by the Government representatives, it was not reasonable for the Government to expect that all of these problems would be corrected within 10 days.

Our conclusion that, as of February 15, February 19 was not a reasonable delivery date is further supported by evidence contained in the record before the Board showing plaintiff's refusal to agree on February 15 to a firm and final February delivery date. After plaintiff refused to fill in the blanks in the February 15 letter, plaintiff asked the Government to return and resume testing. The Government admittedly proposed February 19 as a suitable date, which plaintiff proceeded to accept. However, by agreeing to this date but otherwise remaining silent, the contractor was not acknowledging that February 19 had become the absolute or final contract delivery date. When plaintiff refused to sign the February 15 letter, it clearly indicated that it did not consider any date in February as a reasonable contract delivery date. Consequently, it is illogical to conclude, as the Board apparently did, that, by agreeing to resume testing on February 19, plaintiff was suddenly accepting a date four days away as such a firm date.

must be proven to have been the result of defendant's conduct and not by the plaintiff's necessities. . . . [citations omitted]."

Plaintiff learned by a voluntary inquiry on February 13 that a default decision had been reached. There is nothing in the record that the Government on that occasion threatened to terminate plaintiff for default, the situation existing in both cases cited by plaintiff. In the instant case, plaintiff was informed of the existing state of affairs, i. e., that defendant

considered February 9 as the valid contract delivery date and since the tests conducted on that date were unsuccessful, the Government had decided to terminate plaintiff for default. Therefore, the elements of duress were not satisfied. *However, plaintiff's representations, although perhaps a matter of choice, were certainly influenced by the knowledge it received on February 13 and the attendant pressures.*

Additionally, in view of the contract provisions, the agreement to resume testing on February 19, a mere four days away, should not have been considered an agreement by plaintiff to the Government's desire that testing be completed, on penalty of default, in February. The contract provided that testing might last up to 40 hours, even though the test plan might ideally have been completed in 6 to 8 hours.[12] Presumably, in recognition of the complexity of the project, the parties agreed in the contract that testing might last up to 40 hours.

The record reveals that on February 15, the contractor sought to avoid the very result which occurred on February 19—that the testing would cease without giving plaintiff the opportunity to make repairs. The Government's project engineer, the only Government witness who testified regarding this matter, said that he assured the contractor that the Government would not act in an arbitrary way on February 19. The record supports a finding that some provision for repairs was also agreed upon at the February 15 meeting.[13]

The Government argues that the test results on February 19 were so bad that it was clear that the system was deficient and that further testing should not continue. This point does not obviate the Government's unreasonableness since (1) the contract, recognizing the complexity of the project, contemplated up to 40 hours of test, while plaintiff was only allowed one testing session, and (2) the record indicates that the parties agreed on February 15 that plaintiff would be allowed to make some kind of repairs if needed during the testing period.[14]

Because the Government knew or should have known that a date only four days after an unsuccessful test was not reasonable under the circumstances and because we do not believe the Government could reasonably rely on plaintiff's self-serving statements made to avoid a pending default termination, particularly in light of plaintiff's refusal to agree to a new completion date, it is concluded that the Board's finding that February 19, 1968 was unilaterally established as a reasonable contract completion date under the circumstances is incorrect.

---

12. 3200 ACCEPTANCE TEST

 After the requirements of paragraph 3300 [RFI Requirements] have been met and when the contractor feels that the system is ready for delivery to the Government, an acceptance test shall be run at the contractor's facility. This test shall not exceed forty hours of running time. Within this forty hours, the Government representatives shall be allowed to perform any test necessary to verify compliance with this specification (except those tests which would cause hardware damage to the system and providing such tests were not meant to test the system's design to protect itself from damage).

13. For the same reasons stated in note 9 *supra*, this court has made these findings of fact omitted by the Board. Liles Constr. Co. v. United States, *supra*; Foster Const. C. A. v. United States, *supra*; Maxwell Dynamometer Co. v. United States, *supra*.

14. The Government maintains that it had no alternative but to select unilaterally a delivery date since the contractor refused to agree upon its own projected February 9 delivery date and then further refused to select another delivery date even after it had represented on February 14 and 15 that the system was

ready for delivery. Defendant also says that the contractor sought to prevent the establishment of a new delivery date and thereby require the Government to test and retest the system until it complied with specifications.

 If we carry the Government's argument to its logical conclusion, this court would be required to modify our holding in the *DeVito* case to except reasonableness as a criteria if a showing of bad faith can be made against plaintiff. While such a modification may be justified in some other factual situation, the present case does not mandate such a result. As noted *supra*, the Board found the Government's termination motivation to be in part based on its awareness that budgetary restraints now rendered employment of the ARLS system economically unfeasible given the fact the fixed price option clause had expired. It would therefore seem clear that if bad faith was exhibited in the above case, neither party was lacking in participation. Moreover, our decision does not preclude the Government from unilaterally selecting a new delivery date. It only reaffirms our prior holdings that unilateral selection of a new contract completion date must be properly implemented, i. e., both specific and reasonable.

## TENDER· OF DELIVERY

Plaintiff contends that the Board erred in construing its submission of the ARLS system for testing on February 19, 1968 as a tender of delivery to the Government. It asserts that the Board failed to recognize that plaintiff's representations were made under duress, i. e., the threat of default termination. Defendant argues that the Board was correct in finding that delivery was tendered and that this finding was consistent with the Board's prior decision in Phil Rich Fan Manufacturing Co., Inc., ASBCA No. 12770, 71–1 BCA par. 8694 (1971).

We agree with plaintiff, although not for the reason it asserted.

The Board found, as an alternative basis for its decision, that even if February 19, 1968 was not unilaterally established by the Government as the new contract completion date, defendant still possessed the right to terminate on that date, since plaintiff then tendered delivery and the system did not substantially comply with the contract specifications.

The Board seems to have reasoned that since plaintiff represented on February 14 and 15 that the system was ready for acceptance testing, the failure of the system to meet the test standards constituted the "delivery of a nonconforming product." Given this fact, the Board found that the Government possessed, under Radiation Technology, Inc. v. United States, 366 F.2d 1003, 177 Ct.Cl. 227 (1966) and Phil ·Rich Fan, supra, the right to terminate plaintiff for default.

The error in this conclusion is the failure of the Board to consider the fact that the ARLS system was a *preproduction model* and that the agreement at issue was a *preproduction model* contract. This fact renders both *Radiation Technology* and *Phil Rich Fan* inapplicable.

█ Unlike a situation requiring delivery of supplies (*Phil Rich Fan*) or previously existing products (*Radiation Technology*), a preproduction model must first be acceptable to the Government before the contractor can officially tender delivery of production models, Bailey Specialized Buildings, Inc. v. United States, 404 F.2d 355, 186 Ct.Cl. 71 (1968). One reason for requiring acceptance before delivery is that acceptance of a preproduction model triggers the delivery schedule for production models. In many instances, the preproduction model, after acceptance, becomes the first production model and its delivery is then required subsequent to Government approval of the acceptance testing. *See Bailey Specialized Buildings, Inc., supra*; Astro Science Corp. v. United States, 471 F.2d 624, 200 Ct.Cl. 354 (1973).

█ Even though no production models were required under this contract, we find no reason to apply a different standard for delivery in the present case. As noted earlier, when plaintiff contracted to construct the ARLS system, the · Government was given the option to purchase additional units at the fixed contract price. Had the Government exercised this option, delivery of the additional systems would have commenced after the preproduction model was approved. Under the circumstances, this preproduction model would likely have become the first production model. As such, acceptance would be a condition precedent to official delivery. The fact that no production models were included under this contract fails to alter the *Bailey* rationale.

Both the contract language itself and the conduct of the parties during the February testing period lend support to this conclusion. There is little doubt that the Government desired to terminate the contract for default when testing was resumed on February 19. In addition, plaintiff repeatedly refused to agree to a new contract completion date. At the time plaintiff and the Government resumed testing of the ARLS system, neither side gave any indication that it considered the submission of the system to be tantamount to delivery. Moreover, the relevant clause in this particular contract (set out in full in foot-

note 12) is supportive of our conclusion that delivery could not possibly take place prior to the completion of testing. This clause defines what plaintiff is required to do:

> [W]hen the contractor feels that the system is ready for delivery to the Government, an acceptance test shall be run at the contractor's facility.

It can certainly be easily interpreted from this language, particularly in light of the conduct of the parties, that acceptance testing must be completed and the preproduction model approved before the contractor is required to tender delivery to the Government.[15]

The *Bailey* court specifically stated what the Government must do in order to terminate a preproduction contract based on rejection of the model during acceptance testing. If, based on rejection, the Government decided that termination for default was in order, the contractor was required to be given *written notice* of the decision to terminate ten days in advance of termination, and the contractor was to be permitted to cure defects within the ten-day time span. Had the *Bailey* court viewed submission of a preproduction model for testing to be tantamount to tender of delivery, there would have been no need to recite the above procedure.

 Since plaintiff was neither given such written notice, nor permitted to cure defects, it would seem that the Government raised the delivery question because of its failure to follow proper procedures after rejecting the ARLS system. If a showing had been made that this system was urgently needed by the Government and plaintiff was aware of this need, this failure might have been excusable. Under such circumstances, the Government's failure to follow strictly the default termination procedures might not be fatal. But since it is clear that after November 17, 1967, the Government had no intention to deploy the ARLS system because of its increased cost, no justification can be shown that "time was of the essence" in completing the contract. Given the non-critical nature of the timing sequence, no excuse can be made for the Government's failure to follow proper procedures in its default attempts.

Based on the above discussion, we conclude that a preproduction model must first be acceptable to the Government before the contractor can officially tender its delivery. The proper avenue available to the Government to terminate for default after rejection of a preproduction model is to follow procedures giving plaintiff prior written notice and time to cure. The Board's finding that delivery had been tendered is therefore held to be erroneous.

\* \* \* \* \* \*

 Since the Government had not unilaterally established February 19, 1968, as the new contract completion date, nor had the plaintiff-contractor officially tendered delivery of the system when it submitted the ARLS for accept-

---

**15.** Our interpretation is supported by Bailey Specialized Buildings, Inc. v. United States, 404 F.2d 355, 186 Ct.Cl. 71 (1968). In *Bailey*, a case also dealing with acceptance and delivery of a preproduction model, we stated:

"All that plaintiff was required to do on that date [acceptance testing] was to submit the preproduction tower to defendant for inspection. The plaintiff complied with this obligation. No production tower was required to be delivered until . . . after defendant accepted the preproduction model. The defendant terminated the contract without ever having accepted the preproduction model. We think plaintiff did everything it was required to do by the new schedule, although its model was not approved."

*Id.* 404 F.2d at 360, 186 Ct.Cl. at 81.

It should be noted that the *Bailey* court reached its conclusion even though in *Bailey* a new future delivery schedule had been agreed to, bilaterally, after the Government had waived the original contract delivery schedule. How much stronger, then, is the instant situation when plaintiff repeatedly refused to agree to a new delivery date. By acquiescing to the February 19 testing date, all plaintiff did was submit the ARLS system for resumption of acceptance testing. To construe this action as an implied agreement to tender delivery is in clear violation of plaintiff's demonstrated intention.

ance testing, we find that plaintiff's termination for default was improper.

■ This court has repeatedly stated the remedy available under the contract when a contractor has been improperly terminated for default. Provided the contract contains a termination for convenience clause, the wrongful default is treated as if the contractor had been terminated for the convenience of the Government. *See* John Reiner & Co. v. United States, 325 F.2d 438, 163 Ct.Cl. 381 (1963), cert. denied, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964). The contract in issue contains such a clause.

Under the convenience clause, the contractor is entitled to an equitable adjustment of the amount due. This adjustment is limited to the total contract price. At oral argument, counsel for plaintiff suggested that if we find the contractor had been terminated for convenience of the Government, this court should render judgment for the full contract price. Plaintiff offers this as an alternative to remanding the case back to the Board for a calculation of the amount due. The basis of plaintiff's suggestion is that the contract had been substantially completed, the plaintiff had expended more than twice the original contract price in developing the ARLS and remanding to the Board would unnecessarily prolong the case.

We reject plaintiff's suggestion.

■ If judgment were based on the contract price, this court would be giving plaintiff its anticipated profit for the contract. However, we have already held in Manloading & Management Assoc., Inc. v. United States, 461 F.2d 1299, 198 Ct.Cl. 628 (1972), that in contracts which contain a termination for convenience clause, recovery must be calculated in accordance with that clause and should not include anticipated profits.

■ Since the parties have not addressed themselves to the question of what plaintiff is entitled to recover on the basis of the termination for convenience clause, and since the Board also failed to make any such finding, it is necessary to remand this case to the Board for calculation of the amount due.

We hold that plaintiff is entitled to recover and judgment is entered granting its motion for summary judgment on the issue of liability. Pursuant to Rule 149 of this court, further action in this court will be suspended for six months from this date to allow the parties to return to the Armed Services Board of Contract Appeals for calculation of the amount to which plaintiff would have been entitled if its contract had been terminated for convenience. Pursuant to Rule 149(f) and upon conclusion of the proceedings of the Board, the plaintiff will report the result to the court and the parties will take further action for the final disposition of the case in this court. [See Rule 150] Defendant's cross motion for summary judgment is denied.