SIMMONDS PRECISION PRODUCTS,
INC.

v.

The UNITED STATES.

No. 327–74.

United States Court of Claims.

Dec. 15, 1976.

Paul C. Hill, Tarrytown, N. Y., attorney of record, for plaintiff; Douglas M. Coombs, Tarrytown, N. Y., of counsel.

Lynn J. Bush, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant; Raymond B. Benzinger, Washington D. C., of counsel.

Before SKELTON, NICHOLS and KUNZIG, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case comes before the court on plaintiff's request, filed February 9, 1976, for review by the court of the recommended decision of Trial Judge Lloyd Fletcher, filed January 6, 1976, pursuant to Rule 166(c), on plaintiff's motion and defendant's cross-motion for summary judgment and on defendant's motion, filed May 10, 1976, that the court adopt the recommended decision of the trial judge. Upon consideration thereof, together with the briefs and oral argument of counsel, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the decision as the basis for its judgment in this case. It is, therefore, concluded that plaintiff has failed to establish that the decision of the Armed Services Board of Contract Appeals was legally erroneous, arbitrary, capricious or unsupported by substantial evidence. Accordingly, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is allowed and plaintiff's petition is dismissed. Judgment is entered for defendant on its counterclaim in the amount of $4,324.21.

## OPINION OF TRIAL JUDGE

FLETCHER, Trial Judge: In this contract dispute, the plaintiff, Simmonds Precision Products, Inc., pursuant to the familiar standards of the Wunderlich Act (41 U.S.C. §§ 321–22), challenges the finality of the

adverse decision by the Armed Services Board of Contract Appeals and seeks recovery of $11,087.97 withheld by the Government as liquidated damages under multiple contracts for the supply of aircraft parts and equipment. Simmonds' appeal from the contracting officer's adverse decision was not only denied by the Armed Services Board of Contract Appeals; the Board further allowed a counterclaim by the Government for $4,324.21 in additional liquidated damages not previously withheld. The Board also rejected a $22,000 claim by plaintiff for its alleged additional costs incurred because of Government actions which it says amounted to a constructive acceleration. Since the Board's disposition of the liquidated damage claim appears clearly correct on this record, its findings and decision on those claims are sustained for reasons set forth below. On the claim of constructive acceleration, the plaintiff's petition must be dismissed.

The facts involved will be briefly summarized. Simmonds had been awarded some 36 indefinite quantity supply contracts for aircraft parts and equipment with various delivery dates ranging from December 27, 1970, through September 30, 1971. For reasons mentioned below, by mid-June 1971, Simmonds was either already delinquent, or about to become so, in its deliveries under all of these contracts. By then the Government had become so concerned over the imminent delinquencies that it sent its procurement contracting officer (PCO), William Rehrer, to the Simmonds plant for the purpose of investigation and negotiation of new delivery dates. Rehrer spent the afternoon of June 15, 1971, discussing with plaintiff's personnel new delivery dates for 17 delinquent contracts under which plaintiff had indicated it would be unable to make timely deliveries. Negotiations continued into June 16, 1971 with Rehrer pressing hard for firm delivery dates and stating that as a part of any extension of such dates, the Government would require the addition of liquidated damages provisions to not only the delinquent contracts but also

to those contracts which while not yet delinquent might well become so. Paul C. Hill, Esquire, plaintiff's general counsel and manager, joined the negotiations and insisted that any revised delivery dates could not be firm dates, but merely the best estimates that could be projected at the time. Rehrer responded that he had to have firm delivery dates determined by the following day when he would be departing the plant, and that if firm dates were not set by that time, he might have to put plaintiff's name on the so-called "Contractor Experience List," i. e., a list of those contractors whose capability must be evaluated prior to the award of any contract.

On June 17, the parties met again in a final effort to work out a specific agreement. At this conference, plaintiff did provide new delivery dates, many of which it asserted were necessarily "padded" to insure timely compliance. At this time, plaintiff's representative also described the reasons for the delays it had experienced without, however, attempting to assess the specific impact of any particular delay.

Several of the delays which had seriously handicapped plaintiff were beyond its control, and were given sympathetic consideration by the Government. These delays included: (1) an anti-trust suit filed against the company by the Government and a union (IUE), as a result of which Simmonds had to divest itself of part of its operations; (2) interference by the union with attempts by plaintiff to sell part of its business, accompanied by walkouts and slowdowns; (3) an injunction obtained against the company which had delayed it for over a year in moving its operations from Long Island City to Vergennes, Vermont; and (4) the failure of several of Simmonds' suppliers to fill orders placed with them. Plaintiff claimed that these delays were of sufficient magnitude as to justify a four to six-month extension in the delivery dates, but the Government did not agree. The Government representative instead countered with a proposal of a two to three-month extension as more reasonable.

The time of extension was not the only point of dispute in these negotiations. Another problem revolved around the liquidated damages provisions which the Government demanded in exchange for any time extensions. Defendant had originally insisted upon a rate of one percent per day per delinquent item shipped, with a maximum rate of 25 percent. But plaintiff was able to bargain these rates down to one-tenth of one percent a day per delinquent item, not to exceed 13 percent. With respect to liquidated damages, two different sets of contracts were involved, one set assigned originally to the Long Island City plant and already delinquent, and the other set assigned to the Vergennes, Vermont plant and not yet delinquent. On the latter set of nondelinquent contracts, the parties agreed to a liquidated damages rate of one-twentieth of one percent per delinquent item, with a maximum of 13 percent.

The clause, as finally included, provided for liquidated damages as follows:

> * * * [In] *accordance with ASPR 7–603.39* at a rate of ¹⁄₁₀ of 1% per day [¹⁄₂₀ of 1% for non-delinquent contracts] with a not to exceed maximum rate of thirteen (13) percent. [Emphasis supplied.]

However, the ASPR provision referenced in this clause was the wrong provision. ASPR 7–603.39 is for "Termination for Default-Damages for Delay-Time Extensions," and is designed for use in fixed-price *construction* contracts rather than for fixed-price *supply* contracts such as the present ones.

Plaintiff's contract manager watched the contracting officer include the erroneous ASPR in the contracts and asked, "Is that the clause you are putting in?" The contracting officer merely answered in the affirmative and nothing more was said about it between the parties. Even when the contract modifications were formally executed, no one raised a question concerning the erroneous ASPR reference.

Plaintiff again became delinquent in the performance of its contracts after the adoption of the June 17 modification. Whereupon, the Government assessed and withheld liquidated damages of $11,087.97, a figure determined by application of the per-item rate as agreed upon between the parties, rather than by application of the ASPR clause. The contracting officer issued a final decision on December 22, 1972, denying delivery schedule extensions which would have remitted the liquidated damages. On August 21, 1973, the contracting officer assessed an additional $4,324.21 which the Government had failed to deduct through an oversight. Plaintiff's appeal was denied by the Armed Services Board of Contract Appeals.

Plaintiff sets forth five distinct grounds for relief in this case. First, it alleges that the actions of defendant's procurement contracting officer (PCO) in negotiating the time extensions and addition of liquidated damages clauses constituted unlawful duress because, in plaintiff's view, the PCO had previously waived the original delivery dates, and thus any subsequent insistence on those dates was wrongful and coercive. Second, plaintiff asserts that it was entitled to a four- to six-month extension of the production schedules, and therefore the defendant's allowance of only a two- to three-month extension was a constructive acceleration of the contractor's obligations. Third, since the Government did not assert its $4,384.21 counterclaim for previously unassessed liquidated damages until two years after those damages arose, plaintiff urges that the counterclaim is barred as untimely. Fourth, plaintiff attacks the liquidated damages provisions which were included in the then nondelinquent Vergennes contracts, as being unenforceable for lack of consideration. Finally, plaintiff argues that the inclusion of the incorrect ASPR reference in the liquidated damages provisions invalidated those provisions in their entirety. Each of these claims will be discussed separately.

The claim of duress stems from the fact that the Government had acquiesced in Simmonds' early production delays and had urged it to continue production in spite of the various difficulties the company was then encountering. Since it was apparent that plaintiff was about to become seriously delinquent in its performance, it now argues that by its acquiescence, the Government "waived" any right to insist upon the original delivery dates and accepted such delinquencies as might occur. Therefore, it says that when the PCO rejected as unreasonable its request for a four- to six-month extension, and also threatened to place plaintiff's name on the Contractor Experience List and terminate the contracts for default, such threats amounted to duress.

In rejecting the same argument made before it, the Board correctly held that:

We are unable to find pressure exerted by the Government on appellant of such nature and force as to constitute coercion or duress sufficient to void the extended delivery dates and the liquidated damages clauses. The contracting officer's threat to place appellant on the Contractor Experience List unless it offered firm proposed delivery extension dates under the so-called "Long Island" contracts was reasonable. Appellant was delinquent, or admittedly certain to become so, under those contracts. The Government had the right on 17 June 1971, to terminate the delinquent contracts for default, there having been no waiver of delivery dates, as held hereinafter. Instead it gave appellant the opportunity to continue performance, provided appellant offered reasonable extended delivery dates and agreed to inclusion of liquidated damages clauses in both the delinquent contracts and those not yet delinquent. The contracting officer raised the specter of the CEL only when appellant initially suggested extensions of four to six months, which the contracting officer considered unreasonable in light of information he had that several military aircraft had been grounded for lack of parts

and equipment appellant was to have delivered under these contracts. Although appellant offered some reasons for its delinquency, they were not sufficient * * * to constitute excusable causes of delay justifying longer delivery extensions than those accepted by the contracting officer. Under these circumstances there was nothing offensively coercive or unfair in his threat to place appellant on the CEL. ASBCA No. 18110 at p. 8.

■ The record fully supports these findings by the Board, but plaintiff continues to ignore the fact that in his negotiations, the PCO was not seeking to re-impose the original delivery schedules which, plaintiff says, the Government had previously "waived". Rather, the PCO sought only to establish a specific new schedule for deliveries. From the facts known to him, a two to three-month time extension seemed adequate and reasonable, and he threatened default if some such reasonable schedule were not forthwith submitted to him by the contractor. In so doing, the contracting officer appears merely to have followed the guidelines developed by this court concerning waiver by the Government of its right to terminate a contract where the contractor has failed to meet the contract delivery date. See, for example, *DeVito v. United States*, 413 F.2d 1147, 188 Ct.Cl. 979 (1969) and the court's recent decision in *International Telephone & Telegraph Corp. v. United States*, 509 F.2d 541, 206 Ct.Cl. 37 (1975). In the latter case, the court summarized the waiver after breach doctrine as follows at 509 F.2d at 547–48, 206 Ct.Cl. 49–50:

Under the *DeVito* rule, in a waiver after breach situation, time may again become essential and the Government may regain the right to terminate a delinquent contractor for default, if (1) the Government unilaterally issues a notice under the contract's Default clause establishing a reasonable but specific time for performance on pain of default termination, or (2) the parties bilaterally agree upon a new delivery date. * * *

Since the contracting officer believed that a two to three-month extension was a reasonable, specific time for performance, and since there is no evidence to contradict that belief, he appears to have acted well within the scope of his responsibility in threatening termination and listing plaintiff on the CEL. *See, Bailey Specialized Buildings, Inc. v. United States*, 404 F.2d 355, 186 Ct.Cl. 71 (1968) and *Pelliccia v. United States*, 525 F.2d 1035, 208 Ct.Cl. 278 (1975). Plaintiff's assertion that the PCO was "overbearing" and impatient, while suggestive of a personality conflict between the negotiators, is of doubtful relevance. Mere aggressiveness of a Government representative in pursuing his duties can hardly rise to the status of coercion.

■ In addition, there is no real indication that plaintiff's representatives negotiated from such a condition of weakness as to be forced against their will into conceding all Government demands. To the contrary, plaintiff's relative strength in the negotiating sessions is evidenced by the fact that its representatives managed to reduce substantially the extent of the proposed liquidated damages provisions from one percent per day with a 25 percent limit, to ⅒th of one percent per day with a 13 percent limit.

Therefore, since there was neither coercive action by defendant, nor sufficient weakness in plaintiff's position to force it involuntarily to accept defendant's terms, a claim of duress cannot be sustained here. See, *United States v. Bethlehem Steel Corp.*, 315 U.S. 289, 300, 62 S.Ct. 581, 86 L.Ed. 855 (1942).

Plaintiff's second claim for relief is based upon a theory of constructive acceleration. The Board refused to consider that issue on the ground that it had not been mentioned during the Board hearing and was only raised on post-trial brief apparently as an afterthought. On motion for rehearing, however, the Board allowed the acceleration claim to be docketed as a separate

appeal although such appeal was later dismissed without prejudice, on plaintiff's motion, pending the outcome of the case here.

■ Despite the absence of a Board decision, however, the court may properly decide the issue without returning the case to the Board because, even though the evidence may be disputed, "it is of such a nature that as a matter of law the Board could have made only one finding of fact" (*Maxwell Dynamometer Co. v. United States*, 386 F.2d 855, 870, 181 Ct.Cl. 607, 631 (1967)), and it is clear from the facts actually found by the Board on the duress issue discussed above that plaintiff cannot establish a valid claim of constructive acceleration.

■ With respect to the latter issue, the board had found that plaintiff failed to establish entitlement to its requested four- to six-month extension of delivery dates. Although it made general allegations of delays and production difficulties beyond its control, such allegations in the Board's view of the evidence were "unsupported by evidence other than vague generalities." ASBCA No. 18110, p. 8. There was no showing made by plaintiff regarding the impact and extent of such delays (even if excusable) on plaintiff's performance. Certainly at no time did the Government indicate, either expressly or by conduct, that it would agree to the requested four- to six-month extension. In fact, the proposal was flatly rejected so there was never any longer a time schedule in existence from which the agreed-upon two- to three-month extension could be considered an acceleration. Absent an affirmative act by the Government setting forth a more lenient standard than the one eventually imposed, there obviously can be no acceleration. See, for example, *Guaranty Const. Co., Inc.*, GSBCA No. 3109, 70–2 BCA ¶ 8483 (1970). Hence, on any remand for consideration of this issue, the Board would have no choice but to find for the defendant and "[S]uch an empty ritual has no place in a rational

decision-making process." *Maxwell Dynamometer, supra.*

■ There is equal lack of merit in plaintiff's attack on the defendant's counterclaim. Its argument is that the Government may not now assert its counterclaim "on principles of equitable estoppel," because the contracting officer did not assess the $4,324.21 (which includes interest) until approximately two years after the damages were incurred. However, the argument ignores the right of the Government, unmistakably granted by 28 U.S.C. §2415(f), to assert any counterclaim against an opposing party "that arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." See, also, Rule 40(a) of the Rules of the Court of Claims. Since the plaintiff raised the subject matter of the contract in its claim, defendant is entitled to assert a counterclaim arising out of those same contracts.

■ Plaintiff also raises the doctrine of equitable estoppel as barring the Government from pursuing its counterclaim. In asserting such equitable defense, however, plaintiff must introduce evidence of some damage or prejudice suffered by it as a direct result of the Government's delay in asserting its counterclaim. Since plaintiff has shown no such evidence here, the Board's allowance of the counterclaim was proper and must be upheld.

■ Plaintiff's next contention is that the liquidated damages provision inserted into the so-called "Vergennes" contracts was unenforceable for lack of consideration. The basis for this assertion seems to be that, since the Vergennes contracts were not yet delinquent at the time the liquidated damages clause was added thereto, the Government relinquished no right and hence furnished no consideration for the inclusion of the clause. However, the Board correctly found this argument unpersuasive. It overlooks the fact that the Vergennes contracts were merely part of the overall package of contracts being negotiated at one time by the same parties. It is well-settled that, in such a situation, a single consideration (*i. e.,* time extensions on the delinquent contracts) may support several promises, including the addition of a liquidated damages provision to all contracts. Williston on Contracts, § 137A (3d Ed.). In any event, it would seem that the inclusion of a liquidated damages clause involves in its very nature an exchange of consideration since each party to the contract thereby sacrifices an otherwise existing right to prove actual damages in any subsequent litigation with respect thereto and, in effect, settles in advance a potential future dispute. See Williston, *supra,* § 128 fn. 18. See, also, *ITT Gilfillan, Inc. v. United States,* 471 F.2d 1382, 1386, 200 Ct.Cl. 367, 373 (1973).

■ Finally, plaintiff asserts that the erroneous reference in the liquidated damages clause to ASPR 7–603.39 invalidates the entire clause because the ASPR provision provides for liquidated damages on the overall contract, and thus establishes an unenforceable penalty. In this connection, plaintiff objects strenuously to the Board's finding that, since the plaintiff's negotiator was well aware of the erroneous reference and failed to alert the contracting officer thereto, the contractor could not afterwards complain of the error.

However, the Board's decision on this issue is fully supported by substantial evidence. First, the overall damages provision provided by the erroneously included ASPR, even if it could be considered a penalty, was never intended by the parties here to be the measure of damages. To the contrary, the evidence is overwhelming that the parties actually agreed to a per-item rate of liquidated damages rather than to an overall rate as contemplated by the ASPR provision. The clause (except for the erroneous ASPR reference) and the negotiations concerning it clearly contemplated a per-item rate, a result which the parties reached only

after bargaining from a higher per-item figure. Plaintiff confuses the issue by arguing that it understood one *delinquency* would cause default of the entire contract. That may be true, but overall delinquency is a separate issue from overall damages. There is no persuasive evidence to indicate that the parties ever agreed upon "overall" damages, regardless of their intentions as to an "overall" delinquency provision.

Secondly, it appears incontrovertible that plaintiff knew of defendant's erroneous reference to ASPR 7–603.39 at the time the contracting officer was drafting the clause. Indeed, plaintiff states in its main brief at pp. 17–18:

> Looking over defendant's shoulder, plaintiff clearly saw from the ASPR defendant was reading, that this clause was for construction contracts.

Plaintiff then asked the contracting officer, "Is that the clause you are putting in?" When defendant's contracting officer replied "Yes," plaintiff had nothing further to say about it. On these facts, it is manifest that plaintiff accepted the error for its own purposes with knowledge that the referenced clause ran contrary to the agreement at the time. As stated by the court in *J. A. Maurer, Inc. v. United States*, 485 F.2d 588, 594, 202 Ct.Cl. 813, 824 (1973):

> A party cannot, after a controversy has arisen, arbitrarily abandon the contract interpretations it acted on to the other's knowledge when their relations were harmonious.

The original agreement of the parties, according to the well-supported findings of the Board, contemplated a per-item damages rate. Having failed to disavow such mutual understanding at any time during the negotiations or at the time of the incorporation of the ASPR provision, the plaintiff may not disavow it now. Moreover, since there is no evidence that the erroneous inclusion of the ASPR clause as such

worked any hardship upon the plaintiff, damages having been assessed according to the original agreement, the harmless error does not require invalidation of the damages provision actually agreed upon by the parties.

## CONCLUSION

The plaintiff has failed to establish that the decision of the Armed Services Board of Contract Appeals was legally erroneous, arbitrary, capricious, or unsupported by substantial evidence. Accordingly, plaintiff's motion for summary judgment is denied, the defendant's cross-motion for summary judgment is allowed, and plaintiff's petition dismissed. Judgment is entered for defendant on its counterclaim in the amount of $4,324.21.