J. W. BATESON COMPANY, Inc., Appellant,

v.

UNITED STATES of America, Appellee.

No. 19392.

United States Court of Appeals
Fifth Circuit.

Sept. 26, 1962.

---

L. E. Elliott, O. A. Fountain, Donald G. Felzer, Dallas, Tex., for appellant.

Joseph McElroy, Jr., Asst. U. S. Atty., Dallas, Tex., for appellee.

Before CAMERON, WISDOM, and GEWIN, Circuit Judges.

WISDOM, Circuit Judge.

This is an appeal from a judgment against J. W. Bateson Co. for $42,264.93, the amount was allegedly overpaid on a Government construction contract.

Although this controversy is concerned solely with the method of computing the contract price for the construction of 250 houses and certain other buildings at Camp Pickett, Virginia, it is inextricably interwoven with a second contract, also held by Bateson, for construction at Camp Breckinridge, Kentucky. On May 8, 1953, the Government partially terminated this second agreement, under which Bateson was to construct 430 houses, nine

laundry buildings, and one community building. By a letter dated May 11, 1953, Bateson was directed by the Contracting Officer in charge of both contracts to complete only 81 dwelling units at Camp Breckinridge, to cancel the contract with the subcontractor for the prefabricated building materials to be used at Camp Pickett, and to ship 250 of the Breckinridge units to Camp Pickett. The remaining 99 units at Breckinridge were shipped to Piketon, Ohio, for use by another contractor on a Government project there. A final settlement on the Breckinridge contract was made in October 1953. Under the terms of Change Order No. G–8, Bateson received a total profit of $95,812.76, 10.11% of the cost on all the prefabricated material furnished under the Breckinridge contract: the 81 units completed at Breckinridge, the 99 surplus units diverted to Piketon, and the 250 units subsequently erected at Camp Pickett.

These steps required a modification of the Camp Pickett contract. Since the prefabricated materials used for the buildings there were being provided by the Government from the surplus units it had just purchased for Camp Breckinridge, the parties agreed that the Government should receive a credit of $471,-360.98, and Change Order No. G–2, executed in June, 1953, so provided. On October 14, 1953, Change Order No. G–7, making a further reduction of $30,212.05 in the contract price because of a final credit on the prefabricated material, was executed. The parties have stipulated that these credits given to the Government in the change orders did not include Bateson's profit. In other words, the half-million dollar reduction in the Pickett contract sum offset only the cancelled purchase order to Bateson's subcontractor; it did not take into account Bateson's profit on the order, which amounted to $42,264.93, approximately 10% of the $427,752.00 which Bateson would have owed its Pickett subcontractor for 250 prefabricated dwelling units. These figures were computed in the first instance by Bateson and transmitted to the Contracting Officer, who incorporated them into the Change Orders No. G–2 and G–7. Thus, the end result of these two contract modifications was that Bateson collected a profit on all 430 units which it furnished under the Breckinridge contract, and then received a second profit on the 250 units which were not used at Breckinridge, but shipped instead to Camp Pickett. The Government is now seeking to recover the $42,264.93, which, it claims, was erroneously paid on the Pickett contract.

Bateson's first, and primary line of defense is that whereas the modification in the Breckinridge contract constituted a "partial termination," governed by Section 12 of the General Provisions (which are identical in both contracts), the corresponding modification of the Pickett contract was merely a "change," pursuant to General Condition 9. The key difference in these two clauses, insofar as we are here concerned, is that Section 12 provides that in making contract price adjustments for terminations or partial terminations, "the Contracting Officer shall give no consideration to claims for anticipated profits on the portion of the contract work which is not completed"; Section 9, however, stipulates that "if the net cost value of a change results in a credit from the Contractor or subcontractor, the credit given shall be the net cost without overhead or profit." If, therefore, the cancellation of Bateson's order of 250 prefabricated units from its subcontractor was a "change," the allowance of a $42,264.93 profit was proper.

Bateson argues that the Breckinridge and Pickett contracts are two entirely separate matters, and that any connection between them is irrelevant. It concedes that the Government's cancellation of the construction of 349 houses at Breckinridge acted as a partial termination of that contract, but it points out that the work at Pickett was entirely performed, with only the slight variation from the original contract that the Government rather than an independent subcontractor furnished material for the 250 units. This, argues Bateson, was merely a

"change." Bateson performed the same amount of work at Pickett with the Government furnishing the prefabricated material as it would have if the original subcontractor had done it. To clinch the argument, it points to Change Order No. G-2, which specifically stipulates that

"the following change is ordered in connection with Section 9 of the General Conditions:

"The Government will furnish to the Contractor, without cost, and the Contractor is relieved of the obligation to furnish, the materials listed and described on the Schedule attached hereto and made a part hereof as Exhibit 'A'."

██ The easiest answer to these arguments, however, is that the two contracts must be considered together. Whatever may have been their original status as entirely unrelated agreements, after the modification of the Breckinridge contract what was done at Breckinridge had a direct and corresponding impact on what was done at Pickett. Thus when the Director of the Field Office for the Public Housing Administration wrote Bateson on May 11 confirming the partial cancellation of construction at Camp Breckinridge, he treated both contracts as one. Bateson was instructed to "cancel the contract with the subcontractor for the furnishing of dwelling structures on Project VA-8D1, Camp Pickett, in its entirety," and to "re-ship all of the units now on cars at Camp Breckinridge, or en route thereto," to Camp Pickett. This same letter cancelling construction of prefabricated units at Camp Breckinridge cancelled the supply of prefabricated materials at Camp Pickett. Because of this interrelation of the modifications of both contracts, it is difficult to see how what was a "partial termination" in one case could be a "change" in the other. Indeed, the common-sense effect of these modifications was a partial termination of the *construction* aspect at Breckinridge and a corresponding termination of the *supply* aspect at Pickett. The use of a change order form by the Government cannot be decisive as to the legal nature of the modifications, for the modification of *both* contracts—and Bateson concedes that Breckinridge was partially terminated—was accomplished through change order forms.

█ Even if the Pickett contract is considered by itself, however, a construction of the terms of the contract and a comparison of these contractual terms with the magnitude of the elimination of the supply aspect indicates that the Pickett contract was "partially terminated" and not merely "changed." The contract does not define "change order" or "termination order," and as Judge Dooley, the district judge below, pointed out:

"It is obvious that there can be no hard and fast line between a 'termination' and a 'change' in the sense of these contracts. By a shift of circumstances, the two words may be made to verge on each other, or, on the other hand, may be made to stand far apart. Anybody would readily agree that when a contract for 430 buildings is cut down to 81 buildings, there has been a partial termination, and there would be the same unanimity in saying that the use of a shingle roof in place of a composition roof on a house would be a change rather than a termination, yet if a contract for a dwelling and basement has the basement eliminated, there would be a borderline picture, and that fairly could be called a change as readily as a partial termination. The long and short of it is that the proper yardstick in judging between a change and a termination in projects of this magnitude would best be found by thinking in terms of major and minor variations in the plans."

Needless to say, the total elimination of the supply aspect of the Pickett contract was a major variation in the plan. Moreover, Bateson's cancellation of its order for prefabricated material with its subcontractor was precisely the type of ac-

tion contemplated by Section 12b, which stipulated:

"b. Upon receipt of the notice of termination the Contractor shall * * * in the event of partial termination, with respect to the part thereof covered by the notice:

"(2) Cancel all existing orders and subcontracts to the extent such orders and subcontracts are chargeable to the performance thereof * * *."

The contracting officer's letter of May 11, 1953, directed Bateson to "cancel the contract with the subcontractor for the furnishing of dwelling structures on Project VA–8D1, Camp Pickett, in its entirety." Thus, construing the terms of the contract and applying these terms to what actually took place, we conclude that the cancellation of the supply aspect of the Pickett contract was a partial termination, not a change.

Bateson has a second string to its bow. It contends that had a termination procedure been used initially, it could have claimed an equitable adjustment and expenses of termination under subsection (c) of Section 12 and could have appealed from an unsatisfactory decision by the Government contracting officer thereon. In effect, therefore, Bateson is urging that the Government is estopped to assert an improper payment under Section 9, the clause of the contract dealing with changes.

█ It should be noted at the outset that although this suit was filed and process served on June 4, 1958, and although the defendant answered on June 24, 1958, following with an amended answer on March 24, 1959, the estoppel plea was not raised until January 29, 1961, almost two years after the filing of the amended answer. Moreover, Bateson has not established the first prerequisite of an estoppel; it has not shown that its position is any worse because the modification in the Pickett contract was made by means of a change order rather than a termination proceeding. Bateson has shown no extra costs or expenses to which

it would have been entitled had there been a formal "termination," rather than a change. A large credit to the Government would be allowed in either event, and, for all the Record shows, the same items would have been deducted under Provision 12 as under Provision 9, except that the additional deduction of the profit factor would also have been made. Nor is Bateson's estoppel plea aided by Provision 15 of the contract. This section stipulates that "all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer, subject to written appeal by the contractor within 30 days to the head of the department concerned * * *." But the question of whether a modification of a contract is a "change" or "termination" requires a construction of the contract provisions, and is, therefore, a question of law, not governed by this section. Thus, in United States v. Nickel, 10 Cir., 1957, 243 F.2d 924, the Tenth Circuit, in holding that the Government was not required to pay unearned overhead expenses to its contractor, stated that "the payment of overhead undoubtedly turns on an interpretation of contractual language—a question of law of which the courts are made the arbiters."

█ This case boils down to unjust enrichment. Bateson has received a profit on prefabricated materials it furnished, but did not erect, at Breckinridge; it received a second profit on the identical material when it erected it into housing units at Camp Pickett. The determination of the Contracting Officer that Bateson was entitled to this public money cannot be final where, as here, the payment was made under a mistaken interpretation of contractual terms. United States v. Rodiek, 2 Cir., 1941, 117 F.2d 588. Bateson, however, attempts to distinguish overpayments made by the Government in its proprietary or contractual character and those made in its sovereign capacity. It urges that the Government is not acting as a sovereign when it contracts for the construction of houses, and thus should be treated

no differently from a private citizen, who would not be able to recover voluntary payments made with full knowledge of the facts. These payments, however, were made under a mistake of law: an erroneous construction of the contract governing the payments. In these circumstances, the Government is not barred from recovering the money by which Bateson has been unjustly enriched.

"Money paid or other benefit conferred in the belief that it is legally due, this belief being caused by mistake of law, is recoverable just as if the mistake were one of fact if (a) the payment or benefit is given by a municipal or other governmental corporation * * *." 3 Corbin, Contracts § 617, p. 758 (1960 ed.).

In Heidt v. United' States, 5 Cir., 1932, 56 F.2d 559, 560, cert. den'd 287 U.S. 601, 53 S.Ct. 8, 77 L.Ed. 523, where an estoppel plea was also raised against the Government, this Court stated that

"a voluntary payment made by an individual under no mistake of fact is ordinarily not recoverable, because he may do what he wills with his own money. But the rule is quite otherwise in payments of public money made by public officers. [Citations omitted.] They have no right of disposal of the money, but must act according to law, the law operating as a limitation on their authority to pay. The party receiving an illegal payment is bound to know the law, and ex equo et bono is liable to refund it. [Citations omitted.] The long continuance of overpayments illegally made does not prevent their recovery, even when contractual relations are involved. [Citations omitted.] Much less where, as here * * * [the payments] are regulated wholly by law."

The rule is the same when the Government is acting in a "proprietary" capacity as when it is acting in a "sovereign" capacity. Indeed, even if such a distinction between various actions by the Government could be sustained—and the defendant has offered no rational criterion upon which to base such a distinction [1]—it is difficult to see any reason for allowing recovery of public money in the one case and denying it in the other. In both instances public money has been improperly paid out by the unauthorized act of a public official and the public has suffered harm equally whether the Government acted as a "sovereign" or as a "private citizen."

The judgment of the district court is

Affirmed.

CAMERON, Circuit Judge,

I concur in the result.

1. In the related area of municipal liability for torts no clear standard for distinguishing "governmental" activities from "proprietary" activities has been developed, and courts have not agreed on the proper classification of related municipal functions. Thus, according to Dean Prosser:

"The planning and laying out of streets and highways, or of sewers and drains, usually is regarded as involving legislative or administrative discretion, and so as 'governmental;' and the same is true, in general, of the regulation of traffic. The actual construction of highways, or of other public improvements, on the other hand, is regarded by most courts as a mere 'ministerial' act for which a city may be liable in tort, although some have considered it 'governmental.' The main-tenance and operation of streets and sewers likewise is treated by the greater number of courts as a 'properietary' or 'ministerial' function of cities, although they have found it difficult to explain why it is any less 'governmental' than others, and some authority is found to the contrary. On the part of counties, however, it usually is held that there is no liability for defective highways, even where the city would be liable. Parks, playgrounds, and other recreational facilities, on the other hand, are considered by the majority to be 'governmental,' and by a strong minority as 'proprietary' or 'corporate.' There is little than [sic, that ?] can be said about such distinctions except that they exist, and that they are highly artificial." Prosser, Torts § 109, pp. 777–79 (2d ed. 1955).