**ROBINSON CONTRACTING COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 99–86C.

United States Claims Court.

April 25, 1989.

the Corps of Engineers (Corps) for construction of revetments on a small island in Mobile Harbor, Alabama. Once underway, plaintiff encountered difficulties and fell behind schedule. Therefore, the parties negotiated over a remedy for the delays. These negotiations culminated with a written agreement to drop the remaining work from the contract.

After receiving the final payment under the agreement, plaintiff claimed that the contract should have been terminated for the convenience of the Government. Plaintiff instituted a claim in the United States Claims Court on February 18, 1986. This court received this case by assignment on October 17, 1988 and heard argument on the pending motions on December 9, 1988.

This court must resolve plaintiff's motion for partial summary judgment and defendant's cross-motion for summary judgment. On the basis of briefing and oral argument, defendant has proven a valid accord and satisfaction. Therefore, this court grants the motion of the United States and denies plaintiff's motion.

### Facts

In 1982, plaintiff entered into a construction contract with the Corps for test revetments on Theodore Disposal Island in Mobile Harbor, Alabama. The contract required RCC to construct seven test revetments along the "high energy" southeast curve of the island. The project proposed to ascertain the best material for permanent barriers against tide and weather erosion. Thus, each embankment tested a different combination of bedding materials—stone, shells, filter cloths, and rip rap—for suitability as a breakwater.

David C. Romm, Vienna, Va., atty. of record, for plaintiff.

David B. Stinson, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

### OPINION

RADER, Judge:

Plaintiff, Robinson Contracting Company, Inc. (RCC), entered into a contract with

This revetment project was necessary to preserve the tiny island. The Corps had created the island by depositing its dredging residue in a single location. Erosion threatened to wash the island back into the sea. The Corps sought timely action on the contract to save the island as a protection for the channel into Mobile Bay. The contract, with a fixed price of $274,661.00, required completion within seventy-five

days after issuance of the notice to proceed. By these terms, the plaintiff would have finished the project on January 1, 1983.

After undertaking work on the island, plaintiff encountered soft ground, inclement weather, and shoreline erosion. The revetment construction lagged far behind schedule. On at least three occasions before the completion date, the Corps' contract administrator visited the work site to discuss delays.

On January 3, 1983, the Corps held a conference with the contractor to discuss the delays and other alleged deficiencies in performance. This meeting triggered an exchange of letters. On January 6, 1983, Mr. Robinson, President of RCC, explained that plaintiff had suffered a "tremendous amount of work loss due to adverse weather and to unfortunate causes beyond our control...." In a January 28 letter, the Corps notified plaintiff of performance deficiencies: "[W]ork in this area is not acceptable as constructed." On February 3, plaintiff requested a conference "to discuss perhaps invoking the provisions of paragraph 18 of the general provisions of the contract...." Paragraph 18 of the contract permits the Government to terminate the contract for its own convenience. The Corps' February 9 response stated that the Government preferred to "have the construction, as per the contract specifications ... completed."

The contracting officer, Lt. Col. Ronald Krizman, sent a further letter on March 8 requesting plaintiff to furnish "in writing your comprehensive and detailed plans for accomplishment of the remainder of your contract." This letter also advised plaintiff that the Corps was "considering issuing ... an interim unsatisfactory ... evaluation report." Plaintiff's surety company received a copy of this letter.

These exchanges led to a meeting on March 29, 1983. The contracting officer, Lt. Col. Krizman, and the contract administrator, Mr. Paul Warren, attended for the Corps. Mr. Robinson and Mr. Michael Knight, RCC's attorney, attended for plaintiff. During that meeting, the parties openly discussed several options, including termination for convenience of the Government, termination for default of the contractor, deletion of the remainder of the contract, and plans to complete the contract.

At the close of that meeting, the Corps requested plaintiff to submit by April 8 a plan for completion of the contract. In response to that request, the plaintiff submitted on April 7 a proposal for completion of the work. In conjunction with that proposal, plaintiff notified the Corps that it had incurred costs of about $229,316.26 to complete 35% of the contract work. The cover letter for the April 7 document included the following language:

> I certify to you that this claim and these suggestions are made in good faith.... I also certify that the amounts requested for payment and for the suggested extra work required accurately reflect the contract adjustment for which I believe the Government is liable or for which the Government should be responsible to properly complete the project.

No significant progress on the contract work occurred after the March 29 meeting. Accordingly, on or about April 21, 1983, the Corps met with plaintiff and proposed deleting the remaining work from the contract. Plaintiff indicated interest in such a proposal.

On April 29, Mr. Robinson, his attorney (Mr. Knight), and several representatives of the Corps met to discuss the proposal. The Corps suggested modifying the contract to delete the balance of the work. Under this plan, the Corps would compensate plaintiff for the reasonable and legitimate costs of shutting down the job. Plaintiff agreed verbally to the contract modification plan and reiterated his desire to get out from under the contract.[1] Upon hearing Mr. Robinson's assent to the proposal, Mr. Knight "indicated that he did not believe that his services were needed any

---

1. Affidavit of Mr. Freddy R. Jones, Def. Brief filed June 9, 1987, App. at 1.

longer and excused himself" [2] from the meeting. The parties agreed to meet again to determine the costs of closing the project.

On May 2, 1983, the parties met to negotiate the terms of the change order. The parties reviewed plaintiff's close-down cost proposal. Due to some minor disputes, the parties agreed to meet again to negotiate the final costs.

The parties reconvened for a final meeting on May 10, 1983. At that time, plaintiff and the Corps executed a "Memorandum to File" which stated:

It is certified below that Mr. Paul J. Warren, Authorized Representative of the Contracting Officer and Mr. C.E. Robinson, Jr., Contractor: Robinson Contracting Co., Inc. have negotiated a change order agreement reducing the scope of the original contract. Final total earnings to the contractor under the change order will be $157,681.68.

On several successive pages, the Memorandum itemized the close-down costs which the Corps agreed to pay to plaintiff. At this time, plaintiff had completed about 600 of the 1750 feet of shoreline, nearly 35% of the contract work.

The May 10 agreement Memorandum also included a page with the heading "Findings of Fact In Support of a Change Order." Lt. Col. Krizman's signature block appeared at the bottom of the page. These findings declare that:

This change ... [is necessary] due to a tumultuous erosive process that has taken place since the contract work was begun.... No specific data was available for the condition to which the island surface would be subjected....

On May 13, the Corps issued a confirming telegram to plaintiff which states:

In accordance with the discussion with you by my authorized representative, Mr. Paul Warren, the government is preparing to delete the remaining contract work. This would be accomplished by a GP–3 Change Modification to the contractor. The forthcoming modification will reflect an approximate decrease of $121,889.32 in contract price as agreed upon during negotiations on 11 May 1983 between you and Mr. Warren. This telegram confirms our verbal agreement that you may cease all [contract] work pending the finalization of the bilateral modification for this contract. Request your confirmation by telegram.

The plaintiff responded three days later with the following confirming telegram:

In accordance with the discussion with your authorized representative, Mr. Paul Warren and myself, GP 3 Change Modification to the contractor reflecting an approximate decrease of $121,889.32 is agreeable with Robinson Contracting Company Inc. This telegram is to confirm our verbal agreement and our contractual work has ceased as of 16 May 83.

Later the Corps paid the plaintiff the amount specified in these earlier agreements, minus $10.00.

On May 16, when plaintiff ceased work on the project, the Corps assumed the role of prime contractor and completed the work with rented equipment. The Corps expended $418,105.82 in direct costs (and an undetermined amount in indirect costs) to complete the remaining 65% of the project. The completion work took 327 days.

On December 14, 1983, plaintiff accepted a payment which brought the Government within $10.00 of closing the account with RCC. On December 16, 1983, the Corps prepared the formal Contract Modification No. P00005 pursuant to GP 3 of the contract. The plaintiff elected not to sign the standard form 30. Instead, by letter dated 19 September 1984, plaintiff formally submitted to the Government a termination for convenience cost proposal.

After receipt of this proposal, the Corps spent approximately thirteen months conducting a detailed evaluation of the merits of the claim. The Corps' examination included an analysis of differing site conditions, a report by Corps' legal counsel, and

**2.** *Id.*

an audit. After this review, on October 28, 1985, the contracting officer denied plaintiff's request. The contracting officer's report concluded: "Modification P00005 was negotiated, on the part of the Government, in good faith; and, you both verbally and by telegraphic confirmation acknowledged and accepted the modification." This final action by the Corps led to the filing of this suit on February 18, 1986.

## Discussion
### Summary Judgment Standards

RUSCC 56(c) provides in pertinent part that summary judgment shall be rendered forthwith if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." The Supreme Court has underscored the importance of summary judgment procedures:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy, and inexpensive determination of every action."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

Under summary judgment procedures, the moving party bears the burden of showing the absence of any genuine issue of material fact. Meantime the trier of fact must resolve any doubts concerning factual issues in favor of the non-movant. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Mingus Constructors, Inc., v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987); *S.R.I. Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1116 (Fed.Cir.1985).

The Court of Appeals for the Federal Circuit has further clarified the duties of movant and non-movant under RUSCC 56:

> Where a movant has supported its motion with affidavits or other evidence which, unopposed, would establish its right to judgment, the non-movant may not rest upon general denials in its pleadings or otherwise, but must proffer countering evidence sufficient to create a genuine factual dispute.

*Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562 (Fed.Cir.1987).

When both parties move for summary judgment, this court must evaluate each party's motion on its own merits. Accordingly, this court must draw all reasonable inferences against the party whose motion is under consideration. *Mingus*, 812 F.2d at 1391.

### Accord

Defendant moves for summary judgment asserting that the parties, in a written agreement, reached an accord and satisfaction. The undisputed facts in this case, construed to resolve doubts in favor of plaintiff, indicate that the parties agreed to an accord and satisfaction.

■ Plaintiff entered into a written agreement with the Corps to delete the remaining portion of the contract via a change order procedure. As consideration for the deletion, the agreement provided plaintiff with payment of $157,681.68 and with the guarantee that the Corps would abandon default termination remedies. This written agreement constituted an accord.

The Court of Appeals for the Federal Circuit has stated: "The essential elements of an effective accord and satisfaction are proper subject matter, competent parties, meeting of the minds of the parties, and consideration." *Mil–Spec Contractors, Inc. v. United States*, 835 F.2d 865, 867 (Fed.Cir.1987) (quoting *South Corp. v. United States*, 690 F.2d 1368, 1370 (Fed. Cir.1982); *Brock & Blevins Co. v. United States*, 170 Ct.Cl. 52, 343 F.2d 951, 955 (1965); and *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.*, 176 F.2d 73, 76 (10th Cir.1949)). After setting forth these same elements, the Court of Claims explained: "[T]he most common pattern [for accord and satisfaction] is a mutual agreement between the parties in which one pays or performs and the other accepts payment or performance in satisfaction of a claim which is a bona fide dispute." *Brock & Blevins*, 343 F.2d at 955.

This case follows the common pattern. The parties, Mr. Robinson on behalf of RCC, and Mr. Warren on behalf of the Corps, reached a mutual agreement to change their contract. The accord was both oral and written. During an April 29, 1983 meeting, plaintiff's representative orally agreed to drop the remaining work from the contract. At the time of the oral agreement, plaintiff's counsel was also present.

The parties memorialized their agreement with a signed document on May 10, 1983. Mr. Robinson signed for plaintiff, and Mr. Warren, the authorized representative of the contracting officer, signed for the Corps. The written agreement of May 10, 1983, certified that the parties had "negotiated a change order agreement...." The writing clarified that the agreement entailed "reducing the scope of the original contract" and paying plaintiff "[f]inal total earnings" of $157,681.68. Further, this document listed in detail what plaintiff was due under the agreement. Plaintiff endorsed again a separate section of that itemization entitled "Earnings After Payment Estimate No. 6 and Negotiated Settlement (As Of 4 May 1983)." Thus, on behalf of the plaintiff, Mr. Robinson twice signed documents setting forth the essential elements of the May 10 agreement.

By virtue of the May 10 agreement, the parties agreed to drop the remaining contract work through issuance of a change order. The parties had reached a meeting of the minds. The necessary clarity and understanding for a contractual agreement was evident. With the consummation of this agreement, the parties had reached an accord.

The parties reinforced their accord by an exchange of telegrams. The contracting officer by a May 13, 1983 telegram requested plaintiff to confirm "an approximate decrease of $121,889.32 in contract price as agreed upon during negotiations." In addition, the May 13 telegram noted:

> The Government is preparing to delete the remaining contract work. This would be accomplished by a GP–3 Change Modification to the contractor.

The forthcoming modification will reflect an approximate decrease of $121,889.32 in contract price as agreed upon during negotiations on 11 May 1983 between you and Mr. Warren. This telegram confirms our verbal agreement that you may cease all contractual work pending the finalization of the bilateral modification for this contract.

Plaintiff replied by telegram on May 16:

> In reference to contract DACW01–82–CO161 with you for construction of test revetment, ... GP 3 Change Modification to the contractor reflecting an approximate decrease of $121,889.32 is agreeable with Robinson Contracting Company Inc. This telegram is to confirm our verbal agreement and our contractual work has ceased as of 16 May 83.

The parties thus confirmed their agreement to drop the remaining portion of the contract through issuance of a formal deductive change order. These telegraphic exchanges confirmed the accord.

Because the parties anticipated an additional formal writing, namely Contract Modification number P00005, the plaintiff now contends that the agreement was preliminary. In this manner, plaintiff attempts to justify its later refusal to sign the change order document.

The accord, however, was complete on May 10 and confirmed by later telegrams. The issuance of the change order document was a mere formality unnecessary to enforcement of the parties' accord. Nothing remained unresolved after the signing of the May 10 documents. The parties had agreed on all the essential terms of their accord. The detailed attachments to the signed May 10 Memorandum set forth each of the parties' obligations under the accord.

The parties reached an oral understanding on April 29. This oral understanding left some terms of the accord unsettled, namely, plaintiff's compensation for close-down costs. The subsequent negotiations settled those remaining issues. Thus, the May 10 agreement was a complete accord.

For still another reason the May 10 accord was not preliminary. The parties agreed on May 10 to use a formal change order to delete the remaining contract work. The May 10 writing specifically referred to a "change order agreement." Moreover the exchange of telegrams expressly restated the means (a change order) for ending the project. Both parties had agreed on the means to consummate formally their accord. Therefore, the agreement obligated the defendant to issue the change order documents and the plaintiff to endorse them.

■ Like any other valid contractual agreement, one party may not unilaterally escape its obligations without adequate cause. Plaintiff has shown no cause for its refusal to abide by its obligation to execute the formal change order documents. With the May 10 written agreement, the parties reached an accord. Upon satisfaction of that accord, plaintiff must abide by its agreement and endorse the formal modification documents. In sum, plaintiff may not prevail on its argument that the accord was preliminary for two reasons: first, the accord was complete with the signing of the May 10 documents; and second, any potential incompletion was caused by plaintiff's breach of the valid May 10 agreement.

■ On December 9, 1988, during oral argument, plaintiff for the first time argued that its April 7, 1983 letter comprised a claim which was not extinguished by the May 10, 1983 agreement.[3] The content, context, and circumstances of the letter, as well as the subsequent conduct of both parties, however, do not show that plaintiff requested either a termination of the contract for the convenience of the Government or a request for an equitable adjustment on April 7.

The circumstances of the letter do not indicate that plaintiff intended the April 7 communication to constitute a claim. The initial contract completion date was January 1, 1983. By late March, the contract was only 35% complete. On March 29, the parties convened a meeting to discuss a schedule for completion of the contract. Plaintiff was represented by its president and counsel at that meeting and subsequent meetings. During the meeting, the Corps requested plaintiff to state its schedule for contract compliance. Plaintiff stated that it could complete another 175 feet of revetments in two weeks. After some discussion of schedules, the Corps directed plaintiff to complete the 175 feet. At the close of the meeting, the Corps also directed plaintiff to "submit a proposal by April 8, 1983 for the completion of contract work, a summary of the problems encountered, a cost summary of costs incurred to date, and an estimate of costs necessary to complete the Contract Work." Pl. Proposed Findings filed Apr. 7, 1987, ¶ 26.

In response to the Corps' request at the March 29, 1983 meeting, plaintiff "submitted a proposal for completion of contract work." Id., at ¶ 27. This proposal contained "a detailed statement of the problems encountered, a summary of costs incurred to date, and an estimate of the costs to complete the Contract." Id. Thus, the April 7 letter, by plaintiff's ad-

---

3. This argument had not been briefed prior to the oral argument on December 9, 1988:

The Court: Would you show the Court an area where there is [a] distinction? You understand this is a point that I do not believe was briefed. So it is important, I think, for us to take a little closer look at it.

Am I correct, this was not briefed?

Mr. Romm: I believe you are correct.

Transcript of Proceedings, No. 99–86C, Dec. 9, 1988, at 50.

Counsel for defendant also had no advance notice of this argument:

The Court: When was the first time that the Government, or Counsel, heard the argument that we have heard today about the April 7th proposal?

Mr. Stinson: Your Honor, I was not really aware it was the argument of the Plaintiff's until this afternoon. That this somehow had not been addressed, and it was a separate claim than what had been considered in the May 10th memorandum to the file.

In fact, Your Honor, there is no evidence that Robinson thought that he had a right to pursue other claims in between the time that it signed the May 10th memorandum to the file, and the time it sent its May 14, 1984 letter.

Id., at 86.

mission as well,[4] was not a claim, but a proposal for completion of contract work. Moreover plaintiff sent the April 7 document in response to a request from the Corps, not as a claim against the Corps. These circumstances show that the April 7 letter was not a claim.

The letter's content further clarifies that it was not a request for payment of additional monies or for a convenience termination. The April 7 document bears the title "Robinson Contracting Company's Response to Corps of Engineers Request of March 29, 1983." This title confirms that the April 7 document was an attempt to comply with the Corps' request for a completion schedule.[5]

Other language from the April 7 submission also indicates that it was not a request for a convenience termination or an equitable adjustment. The cover letter for the April 7 document stated, in part:

> I certify to you that this claim and these suggestions are made in good faith and that the supporting materials which are attached are accurate and complete to the best of my knowledge and belief. I also certify that the amounts requested for payment and for the suggested extra work required accurately reflect the contract adjustment for which I believe the Government is liable or for which the Government should be responsible to properly complete the project.

While the fifth paragraph of the cover letter uses the words "claim and these suggestions" and "contract adjustment," plaintiff does not make a claim for additional compensation.[6] Instead plaintiff requested only two forms of payment—payment for completed work and payment for suggested extra work if the Corps elects to finish the job.

The April 7 document contains the following sections: "I. Detailed Statement of Problems Encountered," "II. Job Expense Summary," and "III. How to Complete Project." In conjunction with these topics, the document lists costs incurred to date and proposes costs for future work. Plaintiff does not state a claim.

The April 7 document did not request additional monies for work previously performed and does not request termination for the convenience of the Government. Instead, under the "How to Complete Project" section, plaintiff noted: "[I]n our opinion ... completion of the contract ... [is] not only economically impractical, but virtually impossible. In our opinion it can be done, however, essentially on the following lines." Plaintiff then proceeded to set forth a completion plan. The language of the April 7 document does not show that plaintiff intended to file a claim that survived the May 10 accord.

The subsequent conduct of the parties shows that neither plaintiff nor defendant considered the April 7 document an outstanding claim. Instead the May 10 accord responded directly to plaintiff's April 7 requests. As mentioned, the April 7 document requested $229,316.24 in costs for finished work and proposed another $352,087.00 to complete the project. When plaintiff reached an accord with the Corps on May 10, the parties agreed to drop any future work from the contract. In the

---

**4.** In his affidavit, Mr. Robinson gives no indication that he believed the April 7 submission constituted a pending claim. In discussing the deductive change order, he stated:

> I agreed preliminarily to the deductive change order proposed by Mr. Warren. My preliminary agreement was given solely out of my concern that the Corps would terminate the Contract for default if I refused to accept Mr. Warren's proposal. Because of the substantial cost to complete the project (estimated at $352,087.00), a default termination would have bankrupt Robinson Contracting and myself.

Affidavit of Mr. C.E. Robinson, No. 99–86C, taken March 25, 1987, at ¶ 18; *see also* Pl. Proposed Findings of Undisputed Fact, filed April 7, 1987, ¶¶ 26–28; Transcript of Proceedings, No. 99–86C, Dec. 9, 1988, at 42, 98.

**5.** The cover letter for the April 7 submission began: "In response to your request the result of our meeting of March 29, 1983, I have attempted to put in understandable form the materials which were desired." Thus, the first sentence of the letter further confirms that plaintiff did not intend the writing as a claim.

**6.** The words "claim" and "adjustment" never recur in the entire April 7 document.

language of the endorsed May 10 writing: "It is certified below that Mr. Paul J. Warren, Authorized Representative of the Contracting Officer and Mr. C.E. Robinson, Jr., Contractor: Robinson Contracting Co., Inc. have negotiated a change order agreement reducing the scope of the original contract." By this language, the parties agreed that plaintiff would not complete the project. The parties thus agreed on May 10 not to adopt plaintiff's $352,087.00 proposal to complete the project.

The accord further specifically provided that the Corps would reimburse plaintiff for costs incurred to date. In the words of the May 10 writing: "Final total earnings to the contractor under the change order will be $157,681.68." The figure of $157,681.68 is less than requested on April 7, but plaintiff agreed that this new amount would constitute "[f]inal total earnings." The May 10 agreement also contained a categorical listing of the costs incurred by plaintiff similar to the breakdown in the April 7 submission. The May 10 document covers, often in the same terms, the cost categories found in the April 7 letter. Thus, the May 10 document responded directly to plaintiff's April 7 cost reimbursement request. No request made by plaintiff on April 7 remained unanswered after the May 10 accord.

Another document demonstrates that the parties did not regard the April 7 submission as a request for a convenience termination. On September 19, 1984, plaintiff wrote: "By this letter, Robinson hereby submits its Termination for Convenience Settlement Cost Proposal including claim entitlement and quantum." If plaintiff believed its April 7 letter instituted the same claim, the September 19 writing would have been unnecessary. In the September 19 letter, plaintiff claimed to have notified the Corps of its termination for convenience claim on March 14, 1984. Yet plaintiff does not mention the April 7, 1983 letter as an earlier filing of the same claim. Instead, in context, plaintiff appears to claim that March 14, 1984—nearly a year after the April 7, 1983 letter—was the first notification of a potential termination for convenience claim. As of September 1984, plaintiff did not consider the April 7 document a termination for convenience claim.

In sum, the content, context, and circumstances of the April 7, 1983 letter do not indicate that plaintiff intended to make a claim beyond reimbursement of costs to date. The conduct of the parties further indicate that the Corps met that request for reimbursement as part of the May 10 accord. Plaintiff does not, even under the favorable standards for summary judgment, show any evidence for this court to inquire further whether the April 7 submission made claims left unaddressed by the May 10 accord. The parties achieved an accord in writing on May 10.

This accord was beneficial to both parties. Plaintiff benefited by receiving payment for completed work and for demobilization (even though the contract was not finished). Plaintiff also escaped any further potential liability for failure to complete the contract. The Corps, fearful that the island would erode back into the bay, achieved a swift removal of the contractor. Thus, the Corps could immediately undertake contract completion.[7] The May 10 accord provided tangible benefits to both parties.

### Satisfaction

According to the May 10 agreement, the Corps paid and plaintiff accepted payment (and other consideration) to satisfy the ac-

---

7. In oral argument, defendant clarified the benefit to the Corps:

The Court: Why was there urgency?

Mr. Stinson: The whole purpose of the contract is to establish what revetments would best serve the Government in keeping this dredge island from pushing back into the Bay. Time is certainly of the essence, because they need to get these revetments in place as soon as possible.

....

The Court: Was this island sinking into the Bay?

Mr. Stinson: Yes, it was sinking into the Bay. By the time of March and April there was a severe erosion of the island. One of the reasons for the erosion was scarification of the island that had been performed by the contractor.

Transcript of Proceedings, No. 99–86C, Dec. 9, 1988, at 12.

cord. As the term "accord and satisfaction" indicates, both an accord and a satisfaction are necessary to bar a claim. *Grad Partnership v. United States,* 4 Cl.Ct. 359, 360 (1984). An accord is an agreement by one party to give or perform and by the other party to accept, in settlement or satisfaction of an existing or matured claim, something other than that which is due. *Chesapeake & Potomac Telephone Co. v. United States,* 654 F.2d 711, 716, 228 Ct.Cl. 101, 109 (1981) (quoting 6 *Corbin on Contracts* Section 1276 (1962).

■ Satisfaction is the execution or performance of the agreement, or the actual giving and taking of some agreed thing. *Chesapeake,* 654 F.2d at 716. After exchange of the confirming telegrams, the Corps paid plaintiff $24,990.00 in Pay Estimate No. 8, dated December 6, 1983. To that date, the Corps had paid plaintiff $157,671.62—$10.00 less than the May 10 agreement amount. Soon after receipt of the $24,990.00, plaintiff repudiated the May 10 agreement and refused to sign the formal contract modification documents. Plaintiff agreed on May 10 to accept $157,-681.62 as part of the consideration in satisfaction of the accord.

For the first time—just two weeks before oral argument and after the close of discovery—plaintiff raised an issue about the Corps' failure to pay the last $10.00.[8]

Plaintiff recently contends that the shortfall shows that the Government did not consider the May 10 agreement a binding accord. Rather, plaintiff argues, both parties considered the May 10 agreement preliminary pending execution of the formal change order.

The May 10 agreement, as discussed earlier, was not preliminary. Moreover plaintiff's actions, rather than actions of the Government, interfered with payment of the final $10.00. Plaintiff repudiated the agreement between the parties soon after receipt of the final payment.[9] Although defendant, as indicated by prior payments, was willing to tender the remaining $10.00, plaintiff's refusal to execute the closing documents intervened.[10] Plaintiff thus was responsible for the *de minimis* shortfall.

■ Plaintiff may not at will rescind the accord. Like other contracts, an accord, if supported by consideration, cannot be validly repudiated except for cause. *See, American Textile Machine Corp. v. United States,* 220 F.2d 584, 587–89 (6th Cir. 1955); *Optimum Designs, Inc.,* ASBCA No. 16986, BCA 74–1 ¶ 10,622, at 50,399, 1974 WL 1636. Plaintiff lacked good cause for repudiation and cannot shift blame to the Corps for a *de minimis* shortfall in satisfaction occasioned by that wrongful repudiation.[11]

---

**8.** On November 23, 1988, plaintiff filed a motion to supplement the record and to request an oral argument on the pending summary judgment motions. Accordingly, this matter arose well after the record on the motions for summary judgment had closed. Defendant claims that plaintiff waived its right to now rely on this argument. Further defendant claims prejudice because the lateness of this new argument prevented presentation of further affidavits concerning the reasons for the shortfall.

**9.** Plaintiff's president, C.E. Robinson, signed a form indicating receipt of the final payment on December 14, 1983. Two days later, the Corps signed and sent the final change order to plaintiff. Only a few days before receipt of the change order document, plaintiff visited the Corps' office and accepted its "[f]inal total earnings" as specified in the May 10 agreement. Defendant argues that, as late as December 1983, plaintiff apparently intended to abide by the May 10 accord. *See* Transcript of Proceedings, No. 99–86C, Dec. 9, 1988, at 19–20.

**10.** In oral argument, defendant explained that the shortfall occurred due to administrative procedures:

> Mr. Stinson: But the bottom line is that is an administrative procedure followed by the Government. It is a way in which the contracting people can assure that the finance people do not close out their records.... The Government has an interest in keeping files open just as a matter of course, until all documents are in and the contractor is in a position to completely close out.

Transcript of Proceedings No. 99–86C, Dec. 9, 1988, at 21.

**11.** The Federal Circuit has recently noted: "[T]he law does not care for, or take notice of, very small or trifling matters." *Washington Red Raspberry Comm'n v. United States,* 859 F.2d 898, 902 n. 22 (Fed.Cir.1988). In light of the overall compensation under this contract, the $10.00 shortfall may be appropriately characterized as *de minimis.*

■ Because the Corps gave and the plaintiff took the agreed settlement amount (and other consideration as well), the Corps has satisfied the accord. Nonetheless plaintiff contends that the accord and satisfaction fails for lack of adequate consideration. Plaintiff argues that payment of monies already owed to the contractor for work performed cannot be consideration for a new agreement.

Plaintiff's contention fails to create a genuine issue about the adequacy of consideration for several reasons: first, the Corps paid plaintiff for more than completed contract work, including demobilization costs; second, the Corps excused plaintiff from further performance of its contractual obligations, which plaintiff had estimated to cost $352,087.00; and third, the Corps also abandoned other possible remedies against the plaintiff, such as default termination. These various forms of consideration adequately satisfy the May 10 accord.

The itemized May 10 document indicates that the Corps paid plaintiff for more than completed contract work. Specifically, the Corps paid plaintiff $10,620.00 for mobilization and demobilization. Because the contract was incomplete, plaintiff had not yet, on May 10, begun demobilization. The telegrams show that plaintiff stopped work on May 16. Demobilization occurred after May 16. The accord paid plaintiff for more than those services performed prior to the May 10 accord. Moreover, defendant had no obligation to pay plaintiff demobilization costs on an incomplete contract. Plaintiff gained these demobilization costs in the negotiations leading to the accord.

As part of the meeting of the minds on May 10, the Corps also released plaintiff from its obligation to perform the remainder of the contract. In the April 7 documents, plaintiff indicated that completion of the contract would cost an additional $352,087.00. In his March 25, 1987 affidavit, Mr. Robinson attested that these costs would have resulted in bankruptcy for plaintiff. Plaintiff acquired a clear benefit from this release.

Similarly plaintiff escaped imposition of default termination remedies. The Corps later expended $418,413.75 to complete the contract. Prior to May 10, the Corps discussed default termination with plaintiff. By entering the accord, plaintiff avoided any potential default termination remedies and the costs of defending against them. Conclusive release from default termination remedies was another form of consideration for the May 10 accord.

Finally, the central inquiry required by the satisfaction doctrine in the context of a summary judgment proceeding is, as previously stated, whether the undisputed evidence demonstrates an "actual giving and taking of some agreed thing." *Chesapeake*, 654 F.2d at 716. Plaintiff received what it bargained to get as a "[f]inal total" settlement. Accordingly, the receipt of the $157,671.68 (with the promise of another $10.00 to come shortly) in conjunction with other benefits fully satisfied the accord.

Having reached an accord and having received the agreed satisfaction, the plaintiff had settled its claims against the Corps.

### Duress

■ The plaintiff moves for partial summary judgment alleging that duress and coercion tainted the agreement between the parties. The undisputed facts in this case reveal that plaintiff voluntarily entered an agreement to settle its dispute with the Corps. Moreover the Corps employed no coercive conduct to achieve the agreement. Accordingly, the agreement was not the product of any coercion or duress.

Recently, the Federal Circuit has set forth the rules governing duress:

(1) One side involuntarily accepted the terms of another.

(2) Circumstances permitted no other alternative.

(3) The circumstances were the result of coercive acts of the opposite party.

*Systems Technology Associates, Inc. v. United States*, 699 F.2d 1383, 1387 (Fed. Cir.1983). This court's predecessor elaborated on the application of the duress doctrine:

[T]hree elements are common to all situations where duress has been found to

exist. These are: 1) that one side involuntarily accepted the terms of another; 2) that circumstances permitted no other alternative; and 3) that said circumstances were the result of coercive acts of the opposite party. In order to substantiate the allegation of economic duress or business compulsion, the (contractor) must go beyond the mere showing of a reluctance to accept and of financial embarrassment. There must also be a showing of acts on the party of the (Government) which produced these two factors. The assertion of duress must be proven to have been the result of the (Government's) conduct and not by the (contractor's) necessities.

*Fruhauf Southwest Garment Co. v. United States,* 126 Ct.Cl. 51, 111 F.Supp. 945 (1953).

Plaintiff's evidence does not meet the test for duress. In the first place, plaintiff entered into the agreement voluntarily. The undisputed facts contain many indicia of voluntariness. During both the initial March 29 meeting and the April 29 meeting at which it verbally agreed to the Corps' proposal, plaintiff was represented by legal counsel.

The parties did not precipitously agree. The progress toward the written agreement on May 10 began on March 29, with a meeting to examine alternatives for the failing. In the interim, the parties held face-to-face meetings on April 29 and May 2, in addition to several telephonic and letter exchanges. These meetings culminated with a written accord on May 10.

The records of these meetings also contain considerable evidence of brisk, good faith, bargaining and negotiation. For example, the "Findings of Fact" attached to the signed agreement state:

The contractor [RCC] originally requested payment of over $229,000. Later he raised that figure to $413,127.92. Through negotiations the contractor lowered his proposal to approximately $175,539.96 and subsequently to a negotiated $157,681.86 total contract price. The Government agrees to this contract price.

Finally, the agreement itself shows evidence of careful negotiation. The signed "Memorandum To File" accord includes eight pages of specific agreements. These pages—under the headings "Mobilization and Demobilization," "Revetment Stone," "Riprap Stone," "Revetment Shell," "Plastic Filter Fabric," "Excavation," "Earth Backfill and Embankment," "Debris Clearance," and "Grassing"—inventory the parties' understandings. These pages contain a detailed listing of completed work, previously purchased materials, and pay rates for each category of work or material. In addition to signing the entire "Memorandum," Mr. Robinson affixed his signature to these attachments under the caption "Approved By:".

Most important, the record does not disclose any improper coercion or duress by the Corps. At worst, the record indicates that the Corps merely insisted on its rights under the contract and reminded plaintiff and its counsel of the severe consequences of default. The Federal Circuit has not considered such conduct offensive. *Liebherr Crane Corp. v. United States,* 810 F.2d 1153, 1158 (Fed.Cir.1987).

The negotiations which culminated with the May 10 agreement spanned many days. During that entire time, the record shows no instance of a Corps officer expressly threatening default termination if the plaintiff refused to sign a supplemental agreement. *Urban Plumbing & Heating Co. v. United States,* 187 Ct.Cl. 15, 408 F.2d 382 (1969), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970). Nor does the record show that the Corps threatened to terminate the contract for default if plaintiff refused to perform additional uncompensated work. *Universal Sportswear, Inc., v. United States,* 145 Ct.Cl. 209, 180 F.Supp. 391 (1959).

Although "[a]n act the Government is empowered to take under law, regulation, or contract may nonetheless support a claim of duress if the act violates notions of fair dealing by virtue of its coercive effect," *Systems Technology,* 699 F.2d at 1387–88, uncontroverted facts disclose no unfairness. The parties negotiated in good

faith over a lengthy time. Plaintiff had every opportunity to fulfill its contract duties or negotiate an alternative. Plaintiff elected instead to accept the proposal to drop the remainder of the contract.

To the extent that plaintiff is now reluctant to abide by the agreement due to looming economic losses, the Federal Circuit has clarified that "economic pressure and 'even the threat of considerable financial loss' are not duress." *Systems Technology*, 699 F.2d at 1387, citing, *International Tel. & Tel. Corp. v. United States*, 206 Ct.Cl. 37, 52, n. 11, 509 F.2d 541, 549, n. 11 (1975).

In light of abundant uncontroverted indicia of voluntariness and no uncontroverted indicia of coercion or unfairness by the Corps, the plaintiff's allegations of duress are unavailing.

### Deductive Change Order

■ The plaintiff moves for partial summary judgment asserting the impropriety of terminating a contract by a change order procedure. Both parties negotiated a written accord, later satisfied, to drop the remaining work by a deductive change order. Therefore plaintiff agreed to effect that accord and issue the formal change instrument.

The plaintiff, in oral argument of this motion and in supplemental briefing,[12] contends that the Federal Circuit has recently required execution of a written standard form 30 for any bilateral contract modification. *See Mil–Spec*, 835 F.2d at 868. Accordingly, the plaintiff argues that the absence of a fully executed standard form 30 in this case invalidates this negotiated agreement.

■ Not only does this argument exalt form over substance, it overlooks important and controlling distinctions between *Mil–Spec* and the immediate case. In the first place, plaintiff agreed in writing (as confirmed by the telegraphic exchange) to issue the formal standard form 30. Plaintiff did not abide by that valid agreement.

Thus, plaintiff's unilateral breech prevented execution of the form 30. Plaintiff cannot expect to escape binding legal obligations on the basis of technical imperfections caused solely by its own failure to honor a contractual agreement. To the extent that *Mil–Spec* does require issuance of a form 30, plaintiff caused the failure to comply. Thus, plaintiff may not escape accountability for its accord due to a technical imperfection caused by its own actions.

In other aspects as well, *Mil–Spec* differs from the present case. The Federal Circuit held in *Mil–Spec* that an oral agreement to settle a claim did not constitute an accord and satisfaction because 1) the Government's negotiator had no authority to bind the Government, 2) both parties agreed that their oral agreement would only be binding when reduced to writing, and 3) the Government's payment by check did not adequately satisfy the terms of the oral agreement.

This case is different in all three instances. In the first place, the accord was not solely oral. Both parties signed a written agreement. The Federal Circuit accentuated the distinction between an oral and a written contract modification:

> Unless and until there was a binding modification to which both Mil–Spec and the contracting officer had agreed in writing, there could not be a binding modification of the contract. The oral agreement ... could not and did not constitute a valid accord and satisfaction.

*Mil–Spec*, 835 F.2d at 867. In this case, the parties agreed in writing. Their agreement was complete and unambiguous. The issuance of the standard form 30 was a mere formality to which both had already agreed. In the second place, the Corps' negotiators had authority to bind the Government. Finally, also unlike *Mil–Spec*, the Corps proffered a valid satisfaction.

The Federal Circuit further noted: "[a]lthough an oral accord and satisfaction

---

12. The final briefing on this motion was complete on August 5, 1987. *Mil–Spec Contractors, Inc. v. United States*, 835 F.2d 865 (Fed.Cir. 1987), was issued on December 16, 1987. Therefore, the parties provided a supplemental brief on these issues.

may be valid in some circumstances, the oral settlement in this case was not a valid accord and satisfaction." *Mil–Spec*, 835 F.2d at 869. Because a written settlement characterizes this case, the plaintiff misplaces its reliance on *Mil–Spec*. The parties complied with the teaching of *Mil–Spec* by entering a complete written agreement.

Plaintiff also relies upon *J.W. Bateson, Inc. v. United States*, 308 F.2d 510 (5th Cir.1962) to show that the parties may not agree to end a contract with a deductive change order. In *Bateson*, the Court of Appeals for the Fifth Circuit determined: "[T]he question of whether a modification of a contract is a 'change' or a 'termination' requires a construction of the contract provisions, and is, therefore, a question of law." *Bateson*, 308 F.2d at 514. Therefore, plaintiff contends, this court should employ legal criteria to decide whether, despite the contrary agreement of the parties, the deductive change order was a termination for convenience of the government.

*Bateson* did not prohibit the Government and the contractor from deleting the majority of the contract work through a deductive change order. In *Bateson*, the Fifth Circuit reviewed two change order forms issued by the Government. *Bateson*, 308 F.2d at 513. In the first, the Government partially terminated a housing project. In the second, the Government used the materials from the terminated project to complete another job. This arrangement resulted in unjust enrichment of the contractor. The Government paid the contractor in *Bateson* a profit twice for the same materials. The Fifth Circuit determined that a Government official mistakenly called the second transaction—a partial termination of a contract to supply housing materials—a change order. Consequently the Fifth Circuit, by action of law, correctly reinterpreted the change order forms as partial terminations. The Fifth Circuit refused to exalt form over substance and permit unjust enrichment.

This case is not the same. In *Bateson*, the parties had not agreed on a particular means of effecting the terminations.[13] Rather, the Government unilaterally and erroneously characterized the transactions as changes. The parties have agreed in advance, with full understanding of the implications, to accomplish deletion of the remaining contract work via a change order. Unlike *Bateson*, neither party erred in characterizing their agreement and neither party was unjustly enriched. Moreover, plaintiff now attempts to disavow its agreement to employ a deductive change order procedure after receiving the full benefits of that agreement. Thus, injustice would occur if plaintiff avoided its agreement. Both parties bargained for, and agreed in writing, to a contract modification via a deductive change order. Under those circumstances, that particular means of effecting the accord was not illegal. *See Kinetic Eng'g & Constr.*, ASBCA No. 30726, BCA 89–1 ¶ 21,397, 1988 WL 134125 (Nov. 14, 1988).

### Waiver

■ Although responsible for a thirteen-month delay in issuance of a final decision on plaintiff's convenience termination claim, the Corps did not waive its right to enforce this accord and satisfaction. The Corps does not waive a valid defense by failing to assert it at the earliest time it is aware of the facts underlying the defense. The Corps asserted its defense in a timely fashion by issuing a final decision and again by making its argument before this court.

### *Conclusion*

No material fact remains in controversy. Defendant is entitled to judgment as a matter of law. Accordingly, this court grants

---

**13.** In oral argument, plaintiff conceded that this was a distinction:

The Court: Was there in [*Bateson*] an agreement by the parties to pursue a particular way of terminating the contract?

Mr. Romm: I do not believe that there was. That is a distinction and I acknowledge that. That there was not an agreement between the parties.
Transcript of Proceedings, No. 99–86, Dec. 9, 1988, at 69.

defendant's motion and directs the clerk to dismiss the complaint.

No costs.